PAUL P. BROUNTAS AND LYNN T. BROUNTAS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CRC CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8231–76, 8497–76, 8698–77, 6255–78.    Filed August 13, 1980.

*Thomas B. Rutter*, for the petitioners.
*Bernard B. Nelson, Richard A. Hartnig, Robert T. Hollohan, Paul F. Kugler, James F. Malloy, Michael K. Phalin*, and *Richard B. Weinstein*, for the respondent.

### SUPPLEMENTAL OPINION

HALL, *Judge:* On December 26, 1979, we filed our original opinion (73 T.C 491) in this case in which we made exhaustive findings of fact which we adopt for purposes of this supplemental opinion. However, the complex nature of the transactions which underlie this case warrants a brief recital of the facts pertinent to this supplemental opinion.

CRC, either on its own behalf or on behalf of a limited partnership (such as Coral I or Coral II), entered into various agreements with a given operator. These agreements (which generally consisted of (1) a lease purchase and turnkey drilling agreement, (2) a loan agreement, (3) a promissory note (note), (4) a mortgage, deed of trust, assignment of security interest (mortgage), and (5) a joint venture agreement) would pertain to a "package" of prospects submitted by an operator. A package usually involved two or more (typically three) noncontiguous oil and gas prospects to be drilled by a single operator. Participation in the various packages was generally shared by many limited partnerships. A limited partnership (such as Coral I) invested in many packages, receiving a small percentage interest in each, in order to obtain diversification.

The above-listed agreements were entered into by the operators and, on behalf of the limited partnerships and CRC (hereinafter collectively referred to as investors), by CRC. Typically, the five agreements were executed simultaneously.

The lease purchase and turnkey drilling agreement provided, first, for the transfer from the operator to the investors of the operator's interest in the oil, gas, and/or mineral leases with respect to the prospects (usually three) in the package. A price (lease purchase price) was stated for each lease in the package. Second, the operator agreed to drill a test well on each prospect at a specified location and to a specified depth. This obligation was absolute, regardless of circumstances or difficulties, foreseen or unforeseen, which might be encountered. The operator was obligated to furnish all equipment, drilling rigs, drilling mud, location preparation, etc., necessary for the drilling of the well. If any well were a dry hole, the operator was obligated to plug the hole and restore the surface. In consideration for this no-out turnkey drilling agreement, which applied to all the prospects in a package, the investors promised to pay the operator a single amount (drilling contract price).

The loan agreement provided that the operator/lender would lend to the partnership or CRC an agreed-upon sum to be used by the partnership or CRC to pay a portion of both the lease

purchase price and the drilling contract price under the related lease purchase and turnkey drilling agreement.[1] The agreed-upon sum was usually 60 percent of the combined lease acquisition cost and turnkey drilling cost, although the percentage varied in some packages. For example, if the total cost of the lease purchase and the drilling contract were $100,000, the loan (hereinafter the note portion) would be $60,000; the remaining $40,000 would be the investors' contribution (the cash portion).

The debt arising out of the loan agreement was evidenced by the note secured by the mortgage. The note was payable solely from production, if any, from the prospect or from certain other prospects (usually two) with respect to which the note was cross-collateralized.

The nonrecourse notes constituted "production payments" within the meaning of section 636[2] and section 1.636–3(a), Income Tax Regs., and, consequently, they are treated for tax purposes as loans from the operators to the partnerships or CRC. The portion of the nonrecourse notes allocable to the lease purchase price is a retained production payment, (see sec. 1.636–1(a)(1)(i), Income Tax Regs.), and is treated for purposes of subtitle A of the Internal Revenue Code as a purchase-money mortgage. Sec. 636(b). The portion of the nonrecourse notes allocable to the no-out turnkey drilling contract is a carved-out production payment (see sec. 1.636–1(a)(1)(i), Income Tax Regs.), and is treated for purposes of subtitle A of the Internal Revenue Code as a mortgage loan on the burdened property. Sec. 636(a).

The loan agreement also provided the operator/lender an option to enter into a completion joint venture with the borrower (i.e., the investors) within 24 hours after a well on a prospect had been logged and tested.

All negotiations between CRC and the operators were at arm's length. The terms of the total contract were fair and reasonable. The operators received the cash portion of the total contract price, plus a nonrecourse note for the remainder of the contract price, and the completion option; in return, the operators sold

---

[1]The total amount borrowed to purchase the lease and to secure the drilling obligation was represented by a single note.

[2]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

the leases to the investors and were obligated, on a no-out basis, to drill the test wells, and if a completion were attempted, to pay all completion costs and reimburse the investors for their lease purchase price plus their tangible equipment.

In 1972, Coral I and Coral II participated in 24 oil and gas drilling packages. Eleven of these packages resulted in all dry holes which were plugged. As as individual investor, CRC participated in 28 packages in 1972. Thirteen of these resulted in all dry holes which were plugged. Additionally, in many other packages, one or more wells were plugged, although in all of the other packages, at least one well was completed as a producing well.

Each Coral partnership and CRC validly elected, pursuant to section 263, to deduct the intangible drilling costs. The amount of the intangible drilling and development costs was the aliquot share of the total price of the turnkey drilling contracts (cash and note portions) for the packages in which Coral I, Coral II, and CRC had direct interests. The portion of the total cost of the lease purchase and turnkey drilling contracts which was allocable to acquisition of the leases was not deducted as an intangible drilling and development cost.

Coral I, Coral II, and CRC claimed abandonment losses in 1972 arising from the alleged abandonment of the mineral leases with respect to prospects which had been tested. The value of the losses was determined by the lease purchase prices paid to the operators.[3] We held that, under the circumstances, the abandonment losses of capitalized leasehold acquisition costs were allowable only when the due date for paying delay rentals passed without payment.

When all the leases for the prospects in a package were entirely "abandoned," the nonrecourse note which was secured by the leaseholds was viewed as worthless by CRC and the partnerships. Thus, as long as CRC continued paying delay rentals with respect to at least one lease in a package in which all the prospects were dry holes, the note with respect to the package would not be "canceled."

---

[3] The lease purchase price consisted of cash and the portion of the nonrecourse note related to the lease purchase.

The sole issues for decision in this supplemental opinion are the amount, timing, and character of petitioners'[4] 1972 and 1973 income derived from the worthlessness of nonrecourse notes used to finance oil and gas drilling ventures.

The formulation of respondent's position on these issues has taken a tortuous path. In his statutory notices, respondent's main line of attack was to categorize the nonrecourse notes as shams, thereby eliminating the income and deduction consequences of the notes. In the alternative, respondent argued that all the nonrecourse notes outstanding as of December 31, 1972, were forgiven during 1973, thereby giving rise to cancellation of indebtedness income. Under this alternative theory, respondent determined petitioners had received the following amounts of ordinary income in 1973:

| Petitioner | Coral I | Coral II | CRC (individually) |
|---|---|---|---|
| Brountas | $5,547.90 | 0 | 0 |
| CRC | 27,895.00 | $27,871 | $399,461 |

Respondent's original briefs and his supplemental briefs indicate that he has abandoned the position asserted in his statutory notices. Rather, respondent now asserts that petitioners should recognize income when the last well in each package of prospects has been plugged.[5] This assertion is premised on alternative, but related, theories of income recognition. The primary argument is that the plugging of all the wells in a package constitutes a constructive abandonment, i.e., a disposition, of the mineral leases burdened by the nonrecourse loans.[6] Respondent contends that, under the facts of this case, the worthlessness of the leases securing the nonrecourse notes makes any subsequent acts of abandonment superfluous and, consequently, the worthless leased properties are effectively abandoned when the last well in each package has been plugged. Accordingly, respondent argues that the tax consequences of the

---

[4] Unless otherwise indicated, the term "petitioners" is used herein to refer to the partnerships in which petitioners (CRC and Brountas) were limited partners, as well as to CRC in its individual capacity (with respect to the transactions in which it participated directly).

[5] Because each of the notes in a given package is cross-collateralized, the possibility of repayment on each of those notes exists until the last well in the package has been plugged and abandoned.

[6] This constructive abandonment is in contradistinction to the formal abandonment, i.e., cessation of delay rentals, giving rise to petitioners' abandonment losses.

constructive abandonment are dictated by section 1.636–1(c)(1) and (2), Income Tax Regs., and sections 1001 and 61(a)(3) of the Internal Revenue Code. In the alternative, respondent claims that petitioners must recognize cancellation of indebtedness income under section 61(a)(12) when the last well in each package was plugged because, under the "all events" test of accrual accounting, the nonrecourse notes became worthless at that time.[7]

Petitioners reported income from the worthlessness of the nonrecourse notes at the time they ceased paying delay rentals with respect to all the prospects in a package. Petitioner CRC reported such income from its direct investments as ordinary, while limited partners, such as petitioner Brountas, reported it as capital gains under the principle of *Stackhouse v. United States*, 441 F.2d 465 (5th Cir. 1971).[8]

At the threshold, petitioners raise two procedure-related issues. First, petitioners contend that respondent should bear the burden of proof with respect to the "income" issues because respondent's alternative determination in his statutory notice was without rational foundation. See *Helvering v. Taylor*, 293 U.S. 507 (1935). In support of their position, petitioners argue that the facts of this case, as evidenced by petitioners' records available to respondent prior to trial and as confirmed by our findings of fact in the original opinion, indicate that many of the nonrecourse notes were paid off subseqent to December 31, 1972. Consequently, petitioners assert that respondent's determination in the statutory notices that all nonrecourse notes outstanding as of December 31, 1972, were canceled or forgiven in 1973 was erroneous and arbitrary within the meaning of *Helvering v. Taylor*.

Whether or not we were to agree with petitioners that the burden of proof shifted to respondent, the result herein would be

---

[7]Respondent has not indicated how much income would be recognizable using either method. The amount, however, would presumably be easily calculable as part of the Rule 155 computation required under the Tax Court Rules of Practice and Procedure because there is no apparent dispute between the parties as to when each package of prospects was plugged.

[8]Petitioners' theory for income recognition does not involve sec. 61(a)(12) which they argue is not applicable. Rather, petitioners argue that they must recognize income pursuant to secs. 752(b) and 731 when the nonrecourse note is canceled. According to petitioners, this cancellation occurs at the same "objective" point in time used by this Court for abandonment loss recognition, i.e., the lapse of the delay rentals.

the same. The evidence introduced during trial pointed clearly to the findings of fact set forth in our original opinion. Under these circumstances, we would not hesitate to find that respondent sustained his burden of proving these facts.

The second matter raised by petitioners is the effect to be given to their "method of accounting" for income from the worthlessness of the nonrecourse notes. Petitioners contend that the procedure which they followed for reporting income, i.e., to recognize income when delay rentals lapsed, constitutes a "method of accounting" within the meaning of section 1.446–1(a)(1) and (2), Income Tax Regs.[9] Petitioners further contend that this "method of accounting" should be accepted by respondent as clearly reflecting income because petitioners have consistently followed this method and because it does not distort income. See sec. 1.446–1(a)(2), Income Tax Regs.

Respondent conceded that petitioners' reporting procedure constitutes a "method of accounting." Nevertheless, respondent argues that the method of accounting employed by petitioners does not clearly reflect income and, therefore, is not an acceptable method of accounting. Sec. 446(b); sec. 1.446–1(a)(2), Income Tax Regs.

It is well settled that an erroneous method of accounting does not become acceptable solely upon the consistent use over an

---

[9]Sec. 1.446–1(a)(1) and (2) provides:

(a) *General rule.* (1) Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books. The term "method of accounting" includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item. Examples of such over-all methods are the cash receipts and disbursements method, an accrual method, combinations of such methods, and combinations of the foregoing with various methods provided for the accounting treatment of special items. These methods of accounting for special items include the accounting treatment prescribed for research and experimental expenditures, soil and water conservation expenditures, depreciation, net operating losses, etc. Except for deviations permitted or required by such special accounting treatment, taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. For requirement respecting the adoption or change of accounting method, see section 446(e) and paragraph (e) of this section.

(2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expenses are treated consistently from year to year.

extended period of time. *Dearborn Gage Co. v. Commissioner*, 48 T.C. 190 (1967). It is similarly well settled that respondent cannot require a taxpayer to change his accounting method to one which is unacceptable or wrong. See, e.g., *Harden v. Commissioner*, 223 F.2d 418 (10th Cir. 1955).

The determination of which proposed "method of accounting," petitioners' or respondent's, clearly reflects petitioners' income depends on when and the extent to which the nonrecourse notes, canceled by virtue of their worthlessness, were required to be included in income. The resolution of that question depends upon the outcome of the legal issues to be decided herein.

That brings us to the basic issues to be decided herein, namely, the amount, the timing, and the character of the income to be recognized by petitioners when their nonrecourse notes became worthless. We previously held that petitioners abandoned a lease for purposes of recognizing a loss when the due date for paying the delay rental on such lease passed without payment. The nonrecourse notes in issue in this case (covering the lease purchase price and the contract drilling price) are "production payments" within the meaning of section 636 and section 1.636–3(a), Income Tax Regs. The amount of an abandonment loss realized on the abandonment of a purchased lease is determined in accordance with section 1.636–1(c)(2), Income Tax Regs., which provides in pertinent part as follows:

(2) In the case of the expiration, termination, or abandonment of a mineral property burdened by a production payment treated as a loan pursuant to this section, for purposes of determining the amount of any loss under section 165 with respect to the burdened mineral property the adjusted basis of such property shall be reduced (but not below zero) by an amount equal to the outstanding principal balance of such production payment on the date of such expiration, termination, or abandonment. * * *

In this case, for example, if petitioners paid $100,000 for a lease, consisting of $40,000 cash and a $60,000 note (which is a production payment treated as a purchase-money mortgage loan under section 636(b)), the amount of petitioners' abandonment loss would appear to be $40,000 (adjusted basis of $100,000 less

outstanding principal balance of production payment included in the basis of $60,000).[10] However, respondent contends that the apparent loss cannot be recognized at the time a particular lease in a package is abandoned because all the prospects in a package are cross-collateralized and we cannot know the amount of the outstanding principal balance of the production payment burdening the property until the note (including both the lease purchase portion and the drilling contract portion) is canceled. Thus, the abandonment loss cannot be calculated until all the leases in a package are abandoned. We cannot read section 1.636–1(c)(2), Income Tax Regs., literally in the case of a cross-collateralized lease or we would have to hold either that the production payments on *all* the leases in a package would reduce basis as to each lease, thereby eliminating any loss, or there would be no reduction in basis as to the first two leases, and there would be a gain on the abandonment of the last lease (assuming three leases in the package) still burdened with a production payment obligated to pay all the unpaid notes. We find the most logical result is to read the regulation to mean that the "outstanding principal balance of such production payment" applies only to the production payment included in the basis of the lease. Under such an interpretation, the ordinary loss recognized on the abandonment of a lease is recognized at the time of such abandonment, determined without regard to the status of the other leases in the package. The time of such abandonment, as we have held, is when an affirmative act of abandonment occurs; in this case, when a delay rental due date passes without payment.

In the case of the drilling contract portion of the deal, the petitioners recognize *gain* on abandonment. Petitioners agreed to pay an operator a drilling contract price consisting of a cash portion and a note portion. The note is nonrecourse and secured solely by production from a package of prospects; in our prior opinion, we held that the contract drilling portion of the note is a carved-out production payment under section 636(a), treated as a mortgage loan. We further held that the face amount of the note was fully includable in the partners' partnership bases as a

---

[10]Respondent concedes on brief (Opening Brief at 16 and 43, et seq.) that this loss is an ordinary loss (either because the lease qualifies as sec. 1231 property that has been sold or exchanged or because the leases are inventory property).

liability under section 752, and that the partnerships are entitled to deductions for intangible drilling and development costs equal to the face amount of the contract drilling price (cash and note portion). As a result in most, if not all, cases, the partners have a zero basis in their partnership interests attributable to the contract drilling price. CRC also would have a zero basis in its interest attributable to the contract drilling price.

The first question we must answer is under what theory do petitioners recognize gain on the abandonment of all the leases in a package. As we previously noted, respondent's primary argument is that the abandonment of all the leases in a package was a disposition of such leases under section 1.636–1(c)(1), Income Tax Regs., and gain is recognized in accordance with such regulation. Respondent's alternative argument is that petitioners recognize cancellation of indebtedness income under section 61(a)(12) when the last well in each package is abandoned because the nonrecourse notes became worthless at that time. Petitioners contend that section 1.636–1(c)(1), Income Tax Regs., does not apply in this case. We agree with respondent that gain is recognized here under section 1.636–1(c)(1), Income Tax Regs., and therefore do not reach the issue of cancellation of indebtedness income.

Section 1.636–1(c)(1), Income Tax Regs., provides in pertinent part as follows:

> In the case of a sale or other *disposition* of the mineral property burdened by a production payment treated as a loan pursuant to this section [sec. 636], there shall be included in determining the amount realized upon such disposition an amount equal to the outstanding principal balance of such production payment on the date of such disposition. * * * [Emphasis added.]

Section 1.636–1(c)(2), Income Tax Regs., quoted in relevant part above, provides that in the case of "expiration, termination, or abandonment" of such a property, for purposes of determining any loss under section 165, adjusted basis shall be reduced (but not below zero) by the amount of the then-outstanding principal balance of such production payment. Petitioners contend that *gain* on an abandonment simply isn't covered by the regulations. They contend that an abandonment cannot be a disposition for the purpose of section 1.636–1(c)(1), Income Tax Regs., because abandonments are separately covered under section 1.636–1(c)(2), Income Tax Regs. We disagree.

While the regulations appear to be most inarticulately drawn,

we conclude that an abandonment at a *gain* is covered by section 1.636–1(c)(1), Income Tax Regs., while abandonment at a loss is covered by section 1.636–1(c)(2), Income Tax Regs. First, the statute itself requires such a result. In section 636, production payments of the types involved in this case are treated as mortgage payments. *Crane v. Commissioner*, 331 U.S. 1 (1947), teaches that on a disposition of a property encumbered by a nonrecourse mortgage, the amount of the mortgage must be included in the amount realized. Section 1.636–1(c)(1), Income Tax Regs., is no more than a restatement of the *Crane* principle. See *Freeland v. Commissioner*, 74 T.C. 970 (1980).

Second, the legislative history requires that we interpret "disposition" to include abandonment. Addressing itself to the disposition of the burdened mineral properties, the Senate Finance Committee stated:

> It is contemplated that the regulations issued on this provision will make it clear that on a sale or other disposition (*including an abandonment*) of a mineral property burdened by a production payment carved out by the taxpayer, and unpaid balance of the production payment will be taken into account in computing the gain or loss on the sale or other disposition. [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 541. Emphasis added.]

We conclude that section 1.636–1(c)(1), Income Tax Regs., promulgated under the express authority of section 636(c), includes abandonments in the term "disposition," and that section 1.636–1(c)(2), Income Tax Regs., is merely an exception to the general rule in subsection (c)(1), an exception applicable only when an abandonment results in a loss.

Third, commonsense requires that we conclude abandonment at a gain under section 1.636–1(c)(1), Income Tax Regs. There is no logical reason for excluding from treatment under section 636 only mineral property burdened by a production payment which is abandoned at a gain.

The second question is *when* petitioners recognize income. That in turn depends on when the investors lost their collateral (leases) for their notes. We held that for purposes of recognizing a loss on abandonment of a lease with respect to the lease purchase price, the abandonment occurred when petitioners permitted the due date for paying delay rentals on the lease to pass without payment. Petitioners contend that, consistent with that position, they abandoned the collateral for the contract drilling price for tax purposes only when they permitted the due

date for paying delay rentals on the last of the prospects in a package (those prospects cross-collateralizing the note) to expire without payment. At that point, there was no means of paying the note and the note became worthless. Respondent asserts that, for purposes of recognizing gain, there was a "constructive abandonment" of the collateral, and the note became worthless when the last test well in each package was plugged and abandoned because, at that point, the leases became worthless, all significant possibility of payment on the nonrecourse notes disappeared, and the notes were effectively canceled. Respondent adds that petitioners cannot indefinitely delay recognition of income by the simple expedient of paying nominal delay rentals.

Here, the evidence does not suffice for us to find as a fact that petitioners continued their delay rentals purely for the purpose of delaying recognition of income on the disposition of their mineral properties. Petitioners contend that they based the continued payment of delay rentals on geological determinations of whether the leases had further geological merit. However, the delay rentals were nominal in amount, and the record discloses no instance in which another well was drilled on a prospect after a dry hole had been drilled, nor was such a prospect ever farmed out, nor did it ever produce any mineral.

Moreover, we have found as a fact that "If a prospect yielded a dry hole, both * * * equipment and the mineral interest were of minimal, if any, value." *Brountas v. Commissioner, supra* at 518 n. 38. Under the circumstances, we need not determine the reason for continued payment of delay rentals, for we believe that once the last dry hole in a package was drilled, the prospects under our facts ceased to have any cognizable value, and that for reasons stated below, this loss of value required the recognition of the gain on the drilling contracts. Certainly, it would be theoretically possible for a hole to be dry and yet to yield geological information warranting a new try on the same prospect. However, this never, in fact, happened on any of the leases here in issue. We find as a fact, here, that in each lease before us, the drilling of a dry hole eliminated any cognizable value of the property as a mineral prospect.

The issue of the timing of recognition of gain on relief of "indebtedness" under section 1.636–1(c)(1), Income Tax Regs., must be distinguished from the issue of the timing of an

abandonment loss under section 1.636–1(c)(2), Income Tax Regs. While, as we have held, recognition of the loss must await the objective act of abandonment, as by letting a lease lapse, we do not believe the same standard applies to the issue of gain from relief of indebtedness. Rather, we believe that the moment it becomes clear that the "loan" will never have to be paid, the "loan" must be viewed as having been discharged. For this purpose, the test must be the practical one of worthlessness of the debt—the point at which a creditor could deduct a bad debt is not when it is absolutely impossible that it could be repaid, but when only an incorrigible optimist would expect repayment. *Ramsay Scarlett & Co. v. Commissioner*, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Likewise, here, we do not believe respondent must wait for his recapture until delay rentals fall due unpaid, but only until the last well from which potential production could repay the debt is a dry hole or runs dry, or until it is otherwise clear as a practical matter to all but the incorrigible optimist that no payment, or further payment, is forthcoming.

In the case of the abandonment loss, a taxpayer believing the lease to be worthless has it in his own hands to nail down his loss by an affirmative act of abandonment. We do not believe that the law gives him the same freedom to stave off recapture of his deductions beyond the point of practical worthlessness of the debt which generated the basis for his writeoff. Such freedom would permit too easy avoidance of the revenue laws. Nor, should he be an incorrigible optimist and continue payment of delay rentals past the point of objective futility, should he be treated better tax-wise than the investor who does the same for purely tax reasons. Accordingly, we do not find it necessary here to determine whether petitioners' continued payment of delay rentals was tax motivated. It was objectively futile, and we hold that a constructive disposition of each mineral prospect occurred for purposes of section 1.636–1(c)(1), Income Tax Regs., as soon as all prospects securing the "mortgage loan" proved to be dry holes or (in cases where production was found) ran dry.

The last question we must answer is the *character* of the gain realized upon the abandonment of all the leases in a package. Here, we are faced with a most extraordinary circumstance. Petitioner CRC reported the gain as ordinary income on the theory that an abandonment was not a sale or exchange, and

does not here contend that this was error. Respondent contends that section 1231 (covering for the years in issue gains on sales or exchanges of property held for more than 6 months and used in a trade or business) applies to the leases abandoned in this case if they had been held for over 6 months, citing Rev. Rul. 68–226, 1968–1 C.B. 362. With petitioners accepting ordinary income treatment and respondent determining the gains are captial gains where the holding period requirement has been met, there is no controversy we can adjudicate. We accept respondent's conclusion, which may reduce petitioners' liabilities, without reaching its merit. The character of the gain realized by CRC and the partnerships is therefore long-term capital gain or ordinary income depending on the holding period.[11]

*Appropriate orders will be entered.*

---

[11]In our prior opinion, we held that the operators received from the partnerships consideration consisting of cash, nonrecourse notes, and completion options in exchange for leases and drilling obligations. With respect to the tax consequences accompanying the grant of the completion options, respondent did not contend that this was a taxable event to the petitioners nor did petitioners contend that they were entitled to deduct any additional intangible drilling costs or to increase their bases in the leases by virtue of the grant of the options. We requested both parties to brief the question of whether the option was a taxable event. After a review of those briefs and the authorities cited therein, we conclude that the grant of the option is devoid of immediate tax consequences to petitioners. Sec. 1.421–6, Income Tax Regs. Whatever income would be generated by the completion options upon their grant, lapse, or exercise, would be correspondingly offset by increases in partnership bases and intangible drilling-cost deductions.