JOHN R. COZZI AND ANTOINETTE V. COZZI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24208-84.          Filed February 18, 1987.

---

*Richard M. Lipton, Jeffrey G. Liss*, and *Ronald L. Boorstein*, for the petitioners.

*Andrew P. Fradkin* and *Thomas C. Borders*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined a deficiency of $26,991 in the petitioners' Federal income tax for 1980 and an addition to tax of $1,350 under section 6653(a) of the Internal Revenue Code of 1954.[1] The issues for decision are: (1) Whether the petitioners realized ordinary income in 1980 as a result of the discharge of debt owed by a partnership in which they were limited partners; and (2) whether the petitioners are liable for the addition to tax for negligence under section 6653(a).

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

## FINDINGS OF FACT

To the credit of both parties, many of the facts have been stipulated, and those facts are so found.

The petitioners, John and Antoinette Cozzi, husband and wife, resided in Chicago, Illinois, at the time they filed their petition in this case. They filed a joint Federal income tax return for 1980 with the Internal Revenue Service.

In 1975, Hap Production Co. (Hap)[2] was formed as an Illinois limited partnership for the stated purpose of carrying on the business of providing technical, financial, and other services in the production of motion picture films. According to the certificate of limited partnership, Hap was to continue in business until terminated by the death, disability, or bankruptcy of the general partners, the sale of all Hap's assets, or December 31, 1990. Howard S. Singer and Zev Braun Productions, Inc. (Braun Productions), were the general partners of Hap. Hap's initial capitalization was $260,000, all of which was provided by the limited partners. Mr. Cozzi invested in Hap as a limited partner.

On May 28, 1975, Hap entered into a production agreement with Map Films, Ltd. (Map), for a motion picture entitled "End of Innocence" (the picture).[3] In such agreement, Hap agreed to perform all the services necessary to prepare a negative of the picture "suitable for use in striking release prints necessary for the distribution, exhibition, sale, rental or other exploitation or use of the PICTURE commercially throughout the world." In exchange for such services, Map agreed to pay Hap $1,160,000, plus costs incurred by Hap to obtain financing of Hap's performance under the production agreement. Under article V of the production agreement, Map agreed to pay Hap $195,000, plus financing costs, on December 31, 1976, December 31, 1977, March 31, 1978, and March 31, 1979, and $190,000, plus financing costs, on March 31, 1980, and March 31, 1981.

On May 28, 1975, Barongreen,[4] Hap, and Map entered

---

[2] As used herein, Hap refers to the limited partnership and anyone authorized to act for the partnership.

[3] The picture was actually produced and distributed under the title "Annie." Such picture is not the famous motion picture "Annie"; it is an X-rated film dealing with the sexual adventures of a teenage female in Hong Kong.

[4] The record does not contain information concerning the business purpose of Barongreen.

into an agreement (the acquisition agreement) which obligated Barongreen to provide all services necessary to produce the picture, including, but not limited to, the following: using Braun Productions and Harry Alan Towers as producers, commencing photography of the picture by May 20, 1975,[5] and delivering to Map, on or before December 15, 1975, a film with a running time of not less than 85 minutes nor more than 120 minutes. Pursuant to such agreement, Barongreen assigned to Map all of Barongreen's current and future rights in the picture with respect to the United States of America, and its territories, ships, and aircraft. Under the terms of such agreement, Map assigned to Barongreen all of Map's rights in the picture for the territories of the world outside the United States of America and Canada, except the Province of Quebec, their territorial possessions, ships, and aircraft.

Map agreed to share with Barongreen any actual money that it received from distribution of the picture in the United States of America. Of such money, Map was to retain the first $150,000, plus interest at 1 percent above the prime rate, Barongreen was entitled to the next $50,000, less such amounts as Barongreen received from distribution of the picture in Canada (except Quebec), Map was to retain the remainder until the total money received from distribution was $400,000, and thereafter, Map was to retain two-thirds and Barongreen was entitled to one-third. Barongreen agreed to pay Hap, by direction of Map provided in the acquisition agreement, $640,000 plus interest. The payments were to be $195,000 plus interest on December 31, 1976, December 31, 1977, and March 31, 1978, and $55,000 plus interest on March 31, 1979.

On May 28, 1975, Hap entered into a nonrecourse loan agreement with Sargon Etablissement (Sargon), a Liechtenstein corporation. By the terms of such agreement, Sargon agreed to lend Hap $640,000 plus interest at 1 percent above the prime rate. Under such agreement, Hap agreed to advance $207,000 from its own sources or other sources available to it for the production of the picture. Hap agreed to repay $195,000 plus interest on January 2, 1977, January 2, 1978, and March 31, 1979, and $55,000 plus

---

[5]Such date was 8 days before the execution date appearing on the acquisition agrement.

interest on March 31, 1980. On May 28, 1975, Sargon also sent a letter of understanding to Hap, which provided that Sargon would retain a first position lien on all proceeds of the picture as security for the loan.

Mr. Towers was the writer and producer of the picture and was president of Barongreen. Ronald A. Tash was a partner in the law firm of Kleinfeld & Tash in 1975 and a principal shareholder in Braun Productions. According to the private placement memorandum for Hap, Kleinfeld & Tash was retained to prepare all legal documents necessary for Hap and to provide on-going legal services.

The Hap private placement memorandum stated that Braun Productions was retained for $49,000 to provide services such as arranging financing, hiring certain actors, coordinating production, and providing production services. It was also stated that Braun Productions was to receive $10,000 and 2½ percent of the profits and losses of Hap in return for organizing Hap, for assuming unlimited liability, and for furnishing management expertise. In addition, Mr. Singer was to receive a management fee of $30,000 and 2½ percent of the profits and losses of Hap.

Filmways Pictures, Inc. (Filmways) (formerly American International Pictures), distributed the picture.[6] On March 27, 1981, Filmways prepared a "Producers Report" stating that the picture was released in April 1976, that it had total revenue of $330,114.04, and that it had to recoup an additional $230,917.21 in order to cover expenses. Despite the terms of the production and loan agreements, Hap did not receive any payments from, or on behalf of, Map and never made any payments to Sargon.

During the years 1977, 1978, 1979, 1980, and 1981, Hap did not send or receive any oral or written communication of any kind to or from Map, or anyone acting or purporting to act on behalf of Map, which modified the production agreement. Specifically, there was no such communication releasing either party from any liability arising from such agreement. During such years, Hap did not take any action to abandon or release its interest in such agreement or enter into negotiations with any party to abandon or release such interest. During such years, Hap did not send or receive

---

[6]The record does not contain a copy of the distribution agreement.

any oral or written communication to or from Sargon, or any person acting or purporting to act on behalf of Sargon, concerning payment of the debt owed by Hap to Sargon under the loan agreement, concerning a release of Hap's liability under the loan agreement, concerning a transfer or release of collateral securing the loan, or concerning any modification of the production agreement or the loan agreement. During such years, Hap did not take any action to cause the collateral securing the debt to Sargon to be conveyed to Sargon.

On April 8, 1981, the IRS commenced an audit of Hap's partnership tax return for 1978. Mr. Singer retained the law firm of Levin & Hammerman (the law firm) to represent Hap during the audit. During the course of such audit, the IRS requested copies of Hap's returns for 1979 and 1980 from the law firm. Hap had not filed such returns; they were filed with the IRS after such request. On February 9, 1982, Mr. Singer was informed that such audit was concluded and that no change was necessary in the information reported on the return for 1978. Later in 1982, the IRS requested further information regarding Hap's returns for 1979 and 1980 from the law firm. During 1982, the examination of Hap's 1980 return was referred to the Criminal Investigation Division of the IRS. Throughout the examination of Hap's partnership returns for 1978, 1979, and 1980, the IRS inquired as to the status of the nonrecourse liability between Hap and Sargon. The law firm and Mr. Singer consistently denied any knowledge of the status of such liability. On May 27, 1983, Alan Hammerman, as partner of the law firm, was informed by the IRS that its initial conclusion was that Hap realized income from its release from such indebtedness in 1980.

Robert Kolek is the attorney in charge of the tax department at the law firm of Friedman & Koven. Mr. Kolek was retained in late October or early November 1982 by Mr. Singer to represent him in connection with any meetings that Mr. Singer had with the IRS. On December 16, 1982, Mr. Kolek accompanied Mr. Singer to a meeting with the IRS. The purpose of the meeting was to determine Mr. Singer's involvement with Hap. The questions by the IRS concentrated on the reasons for Hap's failure to file

timely returns for 1979 and 1980. Other matters were raised at such meeting, including whether income was realized by reason of debt forgiveness.

Prior to the December 16, 1982, meeting with the IRS, Mr. Kolek received a draft of a proposed settlement between Hap and Map which was dated December 31, 1982. Such draft was prepared by Paula Goedert, an attorney with the law firm of Jenner & Block. Ms. Goedert was representing either Map or Dennis Kleinfeld, an officer of Map and a partner of Kleinfeld & Tash. Mr. Kolek was particularly concerned that such draft did not provide for the disposition of the picture and informed Ms. Goedert that there were matters which he had to review and discuss with Mr. Singer before recommending the settlement to him. On February 18, 1983, Mr. Kolek received a telephone call from Mr. Kleinfeld. In such call, Mr. Kleinfeld indicated that he desired a settlement between Hap and Map as soon as possible.

Alisa Singer is the wife of Mr. Singer and is an attorney with the law firm. After February 18, 1983, Ms. Singer frequently urged Mr. Kolek to do whatever he could to resolve the matter involving Hap and Map. In response to Ms. Singer's urgings, Mr. Kolek arranged a meeting on May 31, 1983 (the May 1983 meeting) with Ms. Singer and Messrs. Tash, Braun, and Hammerman at the law firm's offices. The delay between Mr. Kolek's conversation with Mr. Kleinfeld on February 18, 1983, and the May 1983 meeting was caused by logistical problems arising from the fact that one of the participants resided outside the Chicago area.

At the May 1983 meeting, several matters relating to Hap were discussed. Among such matters were what could be done with the picture, the prospects of Hap's obtaining funds due from Map, the commercial value of the picture, and the costs and consequences of reviving Hap. The possibility of litigation against Map or Mr. Kleinfeld was discussed and rejected; Mr. Kolek believed that suing Map or Mr. Kleinfeld was futile because neither could pay a judgment. Mr. Braun indicated that he believed the picture was worth approximately $50,000. The participants discussed the tax consequences of dissolving Hap and were

aware that such dissolution would result in income to be recognized by the general and limited partners as a result of debt forgiveness. At the conclusion of the meeting, it was decided that Hap should be terminated.

Messrs. Hammerman and Kolek exchanged drafts of a revised proposed settlement agreement between Hap and Map. In addition, Mr. Hammerman prepared drafts of an agreement with respect to the Hap-Sargon transaction. On November 16, 1983, Mr. Kolek sent to Ms. Goedert a draft of the revised settlement agreement between Hap and Map. Such draft and related documents indicated that the settlement would take effect in 1983. However, Mr. Kolek and Ms. Goedert did not confer on such draft until the second half of 1984.

On August 23, 1984, Hap and Map entered into a settlement agreement. Under such agreement, Map assigned to Hap all of Map's "right, title, and interest in and to the Picture, all sales agreements, licensing agreements and distribution agreements concerning the Picture as well as the copyright" to the picture. In addition, Hap and Map mutually released each other from all obligations and liabilities arising out of the production agreement.

On September 1, 1984, Hap and Sargon entered into an agreement to assign interest in the picture and release debt. Such agreement was executed by Mr. Towers on behalf of Sargon. According to the terms of such agreement, Hap assigned to Sargon all of the rights Hap received from Map under the settlement agreement. Sargon accepted the assignment of these rights as full payment of Hap's indebtedness to Sargon under the loan. On September 13, 1984, Hap filed a notice of dissolution of limited partnership, effective as of November 14, 1984.

On its partnership return for 1975, Hap reported an ordinary loss in the amount of $926,302. Of such amount, $640,000 was attributable to the nonrecourse loan from Sargon. The petitioner's distributive share of such ordinary loss was $59,232. Of such distributive share, $41,732 was attributable to such loan. The Hap return for 1976 reported no income, and the only deduction reported was $164 for office expenses. The Hap returns for 1977, 1978, 1979, and 1980 reported no income or deductions. On its return for

1984, Hap reported ordinary income in the amount of $665,466 as a result of the cancellation of indebtedness by Sargon. Mr. Cozzi's distributive share of such income was $42,551.

In his notice of deficiency, the Commissioner determined that the petitioners received $41,732 of income from Hap in 1980 as a result of Hap's recognizing $664,466 of ordinary income in 1980. The Commissioner provided three alternative explanations for Hap's recognition of income in that year: First, the nonrecourse loan from Sargon was discharged, canceled, or satisfied; second, Hap abandoned its interest in the production of the picture, and consequently, was no longer liable for such loan; and third, the tax benefit rule requires the recovery of the tax deductions based on Hap's 1975 and 1976 losses.

## OPINION

First, the petitioners raise a procedural issue. They contend that the Commissioner should bear the burden of going forward with evidence establishing that the petitioners recognized additional income in 1980. Specifically, the petitioners argue that there was neither a factual nor a legal basis for the Commissioner's determination that the petitioners had such income, and that under such circumstances, the Commissioner has the burden of going forward with the evidence. See *Jackson v. Commissioner*, 73 T.C. 394, 403 (1979); *Chaum v. Commissioner*, 69 T.C. 156 (1977).

It is well settled that a deficiency determination ordinarily carries with it a presumption of correctness. *Welch v. Helvering*, 290 U.S. 111 (1933); *Bernuth v. Commissioner*, 470 F.2d 710, 714 (2d Cir. 1972), affg. 57 T.C. 225 (1971); see Rule 142(a), Tax Court Rules of Practice and Procedure.[7] It is also well settled that except where otherwise provided in the Internal Revenue Code or the Rules, the burden of proof and the burden of going forward with the evidence ordinarily rests on the petitioner.[8] *Welch v. Helver-*

---

[7] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

[8] "The burden of proof on the taxpayer in Tax Court proceedings appears to consist of two distinct evidentiary burdens: first, the burden of going forward with sufficient evidence on an issue of fact to entitle the taxpayer to have the issue decided by the court on the basis of the evidence presented, and second, the burden of final persuasion that the evidence introduced at trial meets the requisite level of proof necessary to sustain the taxpayer's litigating position.

*ing, supra*; Rule 142. However, a showing that the statutory notice of deficiency is arbitrary and excessive within the rule of *Helvering v. Taylor*, 293 U.S. 507 (1935), has the effect of shifting to the Commissioner the burden of going forward. *Jackson v. Commissioner*, 73 T.C. at 401.

In asking this Court to find that the notice of deficiency is arbitrary, the petitioners are asking us to explore the underpinnings of that notice. As a general rule, this Court will not look behind the statutory notice to examine the evidence used by the Commissioner in making his determination. *Riland v. Commissioner*, 79 T.C. 185, 201 (1982); *Jackson v. Commissioner*, 73 T.C. at 400; *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974). However, on rare occasions, we have recognized an exception to such rule and we have looked behind the notice of deficiency in cases involving unreported illegal income where the Commissioner has relied upon a " 'naked' assessment without *any* foundation whatsoever." *United States v. Janis*, 428 U.S. 433, 441 (1976); see *Jackson v. Commissioner*, 73 T.C. at 401. In *Dellacroce v. Commissioner*, 83 T.C. 269 (1984), a case involving allegations of unreported illegal income, the Court held that a notice of deficiency is arbitrary only if it involves a reconstruction of income based on evidence which does not link the taxpayer to the tax-generating activities. 83 T.C. at 280-283.

In this case, the notice of deficiency involves a reconstruction of income based on evidence which links the petitioners to the tax-generating activities. The notice plainly states that the additional income arises from the petitioners' participation in Hap, and the petitioners do not deny such participation. Here, there is no dispute over the fact that the petitioners realized income from the discharge of indebtedness; the only dispute is over the year in which such income is recognizable. Consequently, this case is clearly distinguishable from *Jackson* and the other cases relied upon by the petitioners, and we hold that the notice of deficiency is not arbitrary.

The next issue for decision is whether the petitioners had ordinary income in 1980 in the amount of their distributive

[H. Dubroff, The United States Tax Court: An Historical Analysis 320 (1979). Fn. ref. omitted.]"

share of debt owed by Hap. The Commissioner advances three arguments in support of his determination: Hap's debt to Sargon was discharged or satisfied by a third party, Hap abandoned its interest in the production agreement thereby resulting in its release from the obligation to Sargon, or the tax benefit rule requires recovery of the tax deductions based on Hap's losses reported for 1975 and 1976. With respect to such income, the parties agree that the income, if any, is ordinary income.

It is well settled that gross income includes income from the discharge of indebtedness. Sec. 61(a)(12). The general theory is that to the extent that a taxpayer has been released from indebtedness, he has realized an accession to income because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness. *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931). Whether a debt has been discharged is dependent on the substance of the transactions. Mere formalisms arranged by the parties are not binding in the application of the tax laws. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). Consequently, the surrender or failure to surrender a note is not determinative of the release of liability. *Seay v. Commissioner*, T. C. Memo. 1974-305.

The moment it becomes clear that a debt will never have to be paid, such debt must be viewed as having been discharged. The test for determining such moment requires a practical assessment of the facts and circumstances relating to the likelihood of payment. *Brountas v. Commissioner*, 74 T.C. 1062, 1074 (1980), supplemental opinion to 73 T.C. 491 (1979), vacated and remanded on other grounds 692 F.2d 152 (1st Cir. 1982), affd. in part and revd. in part on other grounds sub nom. *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982); see *Bickerstaff v. Commissioner*, 128 F.2d 366, 367 (5th Cir. 1942); *Kent Homes Inc. v. Commissioner*, 55 T.C. 820, 828-831 (1971), revd. on other grounds 455 F.2d 316 (10th Cir. 1972); *Cotton v. Commissioner*, 25 B.T.A. 1158 (1932). Any "identifiable event" which fixes the loss with certainty may be taken into consideration. *United States v. S.S. White Dental Mfg. Co.*, 274 U.S. 398 (1927).

The Commissioner argues that the production agreement constituted the sole means of paying the loan from Sargon, that the production agreement became worthless and was abandoned by Hap in 1980, and that therefore, Hap was released from the debt in that year and realized income as a result of such release. The petitioners recognize that an abandonment of the security for the debt may result in income, but they argue that in 1980 nothing happened that could be interpreted as indicating that Hap intended to abandon the asset, that the production agreement had not lost its usefulness or value, and that there was no overt act of abandonment.

An abandonment need only be fixed by "identifiable events" taken from the circumstances of the case. *Brountas v. Commissioner*, 73 T.C. at 582-587. An overt act may be sufficient to fix the time of the abandonment of an asset; but such an act is not required, and ultimately, it is the actions of the taxpayer in the context of the circumstances of a case which determine whether an abandonment has occurred. An examination of all the surrounding circumstances makes clear that by 1980, the picture had lost its value to Hap. Payments were to have been made under the production agreement in 1976, 1977, 1978, 1979, 1980, and 1981, but none of such payments were made. Similarly, payments on the loan from Sargon were to have been made in 1977, 1978, 1979, and 1980, but none of such payments were made. In fact, Hap had ceased to function as reflected in its timely returns for 1976 through 1978 and its untimely returns for 1979 and 1980. In addition, as of March 27, 1981, almost 5 years after its release, the picture had total revenues of $330,114 and had to earn $230,917 more to break even. There is no evidence in the record that a reasonable possibility ever existed that the picture would show an economic profit. Mr. Braun's statement at the May 1983 meeting that the picture was worth approximately $50,000 does not convince us otherwise: the record does not indicate the basis for such statement; in fact, the picture had not recovered its cost 7 years after release, and Hap did not receive any money for the picture when the settlement agreement documents were executed in 1984. Such circumstances lead us to conclude that Hap had no

intention of enforcing its rights under the production agreement. In addition, in view of the fact that Mr. Towers was the president of Barongreen and the agent for Sargon in the United States, we conclude that by 1980, Sargon had no intention of enforcing its rights against Hap under the loan agreement.

The fact that the May 1983 meeting focused on various alternatives available to Hap does not change this conclusion. The record makes clear that Hap was a tax shelter which generated significant tax benefits in 1975. Thereafter, Hap ignored its stated business purpose and attempted to fade into oblivion. However, the Commissioner began an audit of Hap in 1981. Such audit eventually led to a criminal investigation. Only after the Commissioner's inquiry were Hap's returns for 1979 and 1980 filed and only after Ms. Singer's urgings, which were a result of the Commissioner's inquiry, was the May 1983 meeting held. The only reasonable explanation for the activities after 1981 is the Commissioner's investigation of Hap; thus, such activities do not support the petitioners' contention that they did not intend to abandon the picture in 1980.

The scheduled final payment by Hap to Sargon in 1980, under the loan agreement, was an "identifiable event" sufficient to evidence Hap's abandonment of the picture. Hap never made any payment to Sargon and never entered into an arrangement to defer any such payment. The final payment under such agreement was an important event, and the failure to make such payment is clear evidence of abandonment.

We observe that the final payment by Hap to Sargon may not be the only "identifiable event" sufficient to fix the time of Hap's abandonment. In 1979, under the acquisition agreement, Barongreen was to make its final payment to Hap on behalf of Map, and in 1981, under the production agreement, Map was to make its final payment to Hap. It is clear that, in cases such as this, it will often be impossible to find one, and only one, event that clearly establishes the time of abandonment; there is likely to be a range of times, any one of which would be reasonable. See *Steadman v. Commissioner*, 50 T.C. 369, 380-381 (1968) (Simpson, J., concurring), affd. 424 F.2d 1 (6th Cir. 1970).

However, the settlement agreement is not within the range of reasonable times. A review of all the circumstances makes altogether clear that, in substance, the production agreement had become worthless sometime before 1984. The execution of the settlement agreements in that year was mere form reflecting nothing more than an attempt by the petitioners to choose that year for reporting the income. In fact, the production agreement became worthless in some earlier year, and there is reason for the Commissioner's selecting 1980 as the year for reporting the income. Consequently, we hold that the petitioners have failed to prove that his determination is unreasonable.

The final issue remaining for decision is whether the petitioners are liable for the addition to tax under section 6653(a). Such section provides for an addition to tax where an underpayment of tax is due to negligence or intentional disregard of rules and regulations. See *Richardson v. Commissioner*, 72 T.C. 818 (1979). The petitioners bear the burden of proving that they are not liable for such addition to tax. Rule 142(a); *Luman v. Commissioner*, 79 T.C. 846, 860-861 (1982).

The petitioners contend that the fact that Hap undertook no affirmative actions pursuant to which the loan was canceled or the production agreement was abandoned negates a finding of negligence for 1980. Therefore, they could not have "guessed" the Commissioner's position regarding their return for 1980. The Commissioner contends that by 1980 Hap was a burned-out tax shelter; Hap purportedly incurred nonrecourse debt solely for the purpose of generating significant tax benefits for its investors, including the petitioners, and then attempted to disappear without facing the tax consequences of its scheme. He states that the petitioners' attempt to "walk away" from Hap, after receiving significant tax benefits, evidences intentional disregard for the rules and regulations.

The petitioners have failed to meet their burden of proof. The record clearly shows that by 1980, Hap could not pay off the loan, and the petitioners have provided no credible explanation for their failure to recognize any income until after the Commissioner began his investigation. Although there could be a reasonable dispute over the year for

reporting the income, there can be no dispute over the fact that the income was reportable for some year, and the petitioners made no effort to report the income until after the Commissioner commenced his investigation.

*Decision will be entered for the respondent.*