T.C. Memo. 2015-91

UNITED STATES TAX COURT

HAROLD C. JOHNSTON, JR. AND LANA S. JOHNSTON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12767-13.                                  Filed May 11, 2015.

<u>Ray Kenji Kamikawa</u> and <u>Chase T. Tajima</u>, for petitioners.

<u>Jonathan Jiro Ono</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a Federal income tax

deficiency of $251,320 and an accuracy-related penalty under section 6662(a)[1] of

---

[1]  Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the year in issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

[*2] $50,264 for petitioners' 2007 taxable year.  The issues for decision are:

(1) whether petitioners failed to report cancellation of indebtedness income (COD

income); (2) whether petitioners are entitled to a business bad debt deduction

under section 166; and (3) whether petitioners are liable for the section 6662(a)

accuracy-related penalty.

FINDINGS OF FACT

I.     Background

Harold Johnston is a native Hawaiian.  He has worked in the

telecommunications industry since 1968.  In 1996 he cofounded Summit

Communications, Inc. (Summit).  Summit provided communications-related

services to businesses in Hawaii until its dissolution.  As a cofounder, Mr.

Johnston served in various roles, including president, chief executive officer, and

director.

Al Hee has a background similar to Mr. Johnston's.  He is a native

Hawaiian.  In 1995 he founded Sandwich Isles Communications, Inc. (SIC).  SIC

provides communications-related services to residents and businesses in Hawaii.

Mr. Hee served as SIC's president for several years and is currently a member of

its board of directors.  He is also the current owner and president of SIC's parent

company, Waimana Enterprises, Inc. (Waimana).

[*3]   In 1997 SIC had an exclusive license as a regulated local exchange carrier to serve residents and businesses on "Native Hawaiian lands" and was in desperate need of an experienced telecommunications industry executive to manage its telephone operations.  Mr. Hee was impressed with Mr. Johnston's extensive experience as a telecommunications industry executive and was convinced that Mr. Johnston would be a good fit for SIC's executive position.  As a result, Mr. Hee began courting Mr. Johnston as a candidate in late 1997 and early 1998.

II.     SIC's Hiring of Mr. Johnston

In December 1997 and January 1998 Mr. Johnston met with Mr. Hee and other SIC executives to discuss the executive position.  During one of these meetings Mr. Johnston explained to them that he intended to stay in Summit because, as the cofounder, he owed a duty to Summit's financial well-being and to its employees.

Despite Mr. Johnston's initial hesitancy to join SIC, Mr. Hee did not stop pursuing the potential deal.  In January 1998, in order to induce Mr. Johnston to join SIC, Mr. Hee made him an unsolicited offer.  The offer included a $96,000 salary, employee benefits, and a loan of $450,000 (SIC loan).  The parties understood that, if Mr. Johnston accepted the offer, he would lend the $450,000 to Summit in order to support its operations.  Mr. Hee required that the SIC loan be

**[*4]** made to Mr. Johnston--and not to Summit--because Mr. Hee did not want to have any financial dealings with Summit's board of directors.

Shortly after the offer was made, Mr. Johnston met with Summit's directors to advise them of SIC's proposal. Mr. Johnston also advised them that, in addition to providing the loan for Summit, SIC was interested in contracting with Summit for operations and technical support services. Up until this date, Summit had sought and obtained equity investors but nevertheless still needed additional funds to continue and grow its operations. Summit's directors therefore approved SIC's arrangement, and Mr. Johnston accepted SIC's offer shortly thereafter.

Mr. Johnston and SIC executed the employment agreement on May 30, 1998. The agreement allowed Mr. Johnston to continue to serve as a director and chief executive officer of Summit. Additionally, the agreement stated that the SIC loan would become due if Mr. Johnston's employment with SIC was ever terminated.

In September 1998 Mr. Johnston requested a loan of $20,000 from Waimana (Waimana loan). Waimana approved the loan, and Mr. Johnston passed the funds on to Summit. Waimana wrote off the Waimana loan in June 2007. On September 14, 2000, SIC sold its interest in the SIC loan to Waimana.

[*5] III.     Mr. Johnston's Resignation From SIC To Rejoin Summit

As agreed in the employment agreement, after Mr. Johnston received the SIC loan, he lent $450,000 to Summit (Summit loan). Additionally, shortly after Mr. Johnston began his employment with SIC, Summit began to receive sizable contracts from SIC. By the end of 1999 Summit's contractual arrangements with SIC generated approximately 60% of Summit's revenue. At this point, it appeared that Mr. Johnston's dual employment with Summit and SIC was going to generate the expected business rewards.

However, in late 2000 it became apparent that Mr. Johnston was needed to manage Summit full time because of its rapid growth. Consequently, on May 15, 2001--with Mr. Hee's approval--Mr. Johnston resigned his position with SIC. Mr. Johnston's resignation from SIC triggered his repayment obligations as to the SIC loan under the employment agreement. SIC and Waimana did not demand repayment of the SIC loan at that time, nor did Mr. Johnston receive a Form 1099-C, Cancellation of Debt, from SIC or Waimana discharging the SIC loan.

IV.    Summit's Bankruptcy Filing

In 2001 SIC received a large loan from the U.S. Department of Agriculture to finance a project to provide telecommunications service to rural communities in Hawaii. With this additional financing, SIC began to hire its own operations and

[*6] technical staff, reducing its reliance on Summit. As a consequence, Summit's performance suffered, forcing Mr. Johnston to reduce expenses, cut salaries, and lay off employees.

On February 13, 2002, Summit filed a petition with the U.S. Bankruptcy Court for the District of Hawaii. After extended chapter 7 proceedings, on July 9, 2009, the bankruptcy court entered its final decree ending Summit's bankruptcy. On December 1, 2009, the Hawaii Department of Commerce and Consumer Affairs administratively dissolved Summit.

In February 2005, Mr. Johnston went back to work for SIC.

V.      Internal Revenue Service (IRS) Audit

On October 15, 2008, petitioners filed a joint Federal income tax return for 2007. Petitioners were insolvent in 2007. In 2010, in connection with an audit of SIC's return, the IRS commenced an audit of petitioners' return for 2007. During the audit petitioners' agreement to an income adjustment of $20,000 related to the Waimana loan resulted in a partial assessment of income tax for 2007.

In 2011 Mr. Hee met with Mr. Johnston and notified him that the SIC loan was still due and owing. Mr. Johnston then arranged to begin making payments on the SIC loan via payroll deductions from his SIC paycheck, initially of $300 per month, then $600 per month, and currently $1,000 per month.

**[*7]** On March 7, 2013, the IRS sent petitioners a notice of deficiency for 2007 determining that they had failed to report COD income. Petitioners, while residing in Hawaii, filed a petition with this Court appealing the IRS' determination.

OPINION

I.     Burden of Proof

As a general rule, a notice of deficiency is entitled to a presumption of correctness, and the taxpayer bears the burden of proving the Commissioner's deficiency determination incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bronstein v. Commissioner, 138 T.C. 382, 384 (2012). However, under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax and meets other requirements, the burden of proof rests on the Commissioner as to that factual issue. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). Our conclusions here are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

II.    COD Income

Section 61(a)(12) defines the term "gross income" broadly to mean all income from whatever source derived, including income from discharge of

[*8] indebtedness.  Whether a debt has been discharged depends on the substance of the transaction.  Cozzi v. Commissioner, 88 T.C. 435, 445 (1987).  Mere formalisms arranged by the parties are not binding in the application of the tax laws.  Id.  Consequently, the surrender of or failure to surrender a note is not determinative of the release of liability.  Seay v. Commissioner, T.C. Memo. 1974-305.

The moment it becomes clear that a debt will never have to be paid, that debt must be viewed as having been discharged.  Cozzi v. Commissioner, 88 T.C. at 445.  The test for determining that moment requires a practical assessment of the facts and circumstances relating to the likelihood of payment and often turns on the subjective intent of the creditor.  Id.  Any identifiable event which fixes the loss with certainty may be taken into consideration.  Id.

A.    The SIC Loan

Respondent argues that petitioners realized COD income in 2007 from forgiveness of the SIC loan.  In support of that position, respondent relies on SIC's and Waimana's failure to take collection action after the SIC loan became due and before the period of limitations for collection expired.  Such inaction, respondent argues, manifests the intention of SIC or Waimana to forgive the SIC loan.

[*9] Petitioners argue that the SIC loan was not discharged in 2007 because it is still outstanding and being repaid. We agree with petitioners.

Mr. Johnston and Mr. Hee[2] testified at trial regarding the SIC loan. Having observed their appearances and demeanors at trial, we find their testimonies on this issue to be honest, forthright, and credible. Mr. Hee testified that Waimana considers the SIC loan outstanding and that he is confident that Mr. Johnston will repay it. Additionally, Mr. Johnston testified that he was specifically told by Mr. Hee that the SIC loan is still due and owing. Mr. Johnston further testified that he is currently repaying the SIC loan via payroll deductions of $1,000 per month from his SIC paycheck. Furthermore, petitioners correctly point out that if the SIC loan had been forgiven, Waimana would have a strong incentive to report the loan as discharged so that Waimana could benefit from a bad debt deduction. Yet Mr. Johnston testified that he did not receive a Form 1099-C from Waimana discharging the SIC loan. Waimana in fact wrote off the Waimana loan in 2007 but not the SIC loan.

Respondent argues that the SIC loan was canceled in 2007 because SIC and Waimana failed to take collection action before the period of limitations for

---

[2] Mr. Hee is the founder of SIC and the current owner of Waimana.

**[\*10]** collection expired.[3] We disagree. Although under some circumstances the expiration of a State limitations period can serve as an identifiable event, it is not conclusive as to when a debt has been discharged. See Bear Mfg. Co. v. United States, 430 F.2d 152 (7th Cir. 1970); Miller Trust v. Commissioner, 76 T.C. 191, 195 (1981) ("State statutes limiting the time within which a creditor may bring an action against a debtor to recover the debt, while of evidentiary value, are not necessarily controlling."). This is because the expiration of the period of limitations generally does not cancel an underlying debt obligation but simply provides an affirmative defense for the debtor in an action by the creditor. Cohen v. Commissioner, 77 F.2d 184, 185 (6th Cir. 1935), aff'g 28 B.T.A. 190 (1933); Miller Trust v. Commissioner, 76 T.C. at 195.

Respondent also takes issue with the fact that Mr. Johnston did not make a payment on the SIC loan until after the commencement of respondent's examination of petitioners' 2007 tax return. Respondent suggests that Mr. Johnston sought to repay the SIC loan only to escape taxes. As a consequence, respondent argues that any repayment activity taken after the commencement of the examination should be discounted. We disagree. The testimony suggests instead that Mr. Johnston sought to repay the SIC loan because he understood that

---

[3] The period of limitations for collection expired in 2007.

[*11] it was his obligation to repay it. Additionally, a reasonable person in this case would not agree to pay an unenforceable debt to save a fraction of that debt on taxes. Repayment, in other words, is against Mr. Johnston's economic interests. Furthermore, the testimony also suggests that respondent's examination merely prompted Waimana and Mr. Johnston to address an overlooked matter. Mr. Johnston testified that he believed either that the SIC loan had been wiped out in Summit's bankruptcy or that repayment had been extended. However, in 2011, after respondent's agent notified Mr. Johnston of the examination, Mr. Johnston met with Mr. Hee and they agreed that the terms of the SIC loan were still in effect.

Waimana and SIC never treated the SIC loan as canceled or otherwise forgiven. Mr. Hee credibly testified that the SIC loan is still outstanding. Accordingly, we conclude that petitioners had no COD income in 2007 with respect to the SIC loan because it is still outstanding and is being repaid.

B.    The Waimana Loan

Respondent also argues that petitioners realized COD income in 2007 from forgiveness of the Waimana loan. Although petitioners now dispute this claim, their agreement to this adjustment during audit resulted in a partial assessment of income tax for 2007. Additionally, the record includes no evidence showing that

**[*12]** Mr. Johnston is repaying the Waimana loan or that Waimana considers the loan outstanding. Furthermore, the fact that the Waimana loan was written off in 2007 demonstrates the intention of Waimana to forgive the loan. Accordingly, we conclude that petitioners had COD income of $20,000 in 2007 because Waimana discharged the Waimana loan during that year.

III.   Insolvency Exclusion

The parties agree that petitioners qualify for the exclusion under section 108(a)(1)(B), which excludes COD income from gross income if the discharge occurs when the taxpayer is insolvent. The amount of income excluded under section 108(a)(1)(B) cannot exceed the amount by which the taxpayer is insolvent. Sec. 108(a)(3).

The parties disagree as to the amount by which petitioners are insolvent. Insolvency is defined as the excess of the taxpayer's liabilities over the fair market value of the taxpayer's assets immediately before discharge. Sec. 108(d)(3). The discrepancies between the parties' insolvency calculations do not make a difference in this case because both amounts exceed the COD income of $20,000. Accordingly, we conclude that the COD income of $20,000 is excludable from petitioners' income.

**[*13]** IV. <u>Business Bad Debt Deduction</u>

Section 166 authorizes a taxpayer to deduct any debt that becomes worthless within the taxable year. Nonbusiness bad debts are treated as losses resulting from the sale or exchange of a short-term capital asset. Secs. 166(d)(1), 1211(b), 1212(b). Business bad debts are deductible as ordinary losses to the extent of the taxpayer's adjusted basis in the debt. Sec. 166(b).

Petitioners argue that they are entitled to a refund because of a business bad debt deduction that resulted from the Summit loan's becoming worthless. However, as respondent correctly argues, petitioners failed to adequately address the fundamental factual issue of when exactly their purported business bad debt deduction claim arose. Petitioners appear to take the position that they are entitled to a business bad debt deduction for 2009, the year in which Summit went bankrupt.

Pursuant to section 6512(b)(1), this Court's overpayment jurisdiction is limited to the same taxable year or years for which the Commissioner has issued a notice of deficiency and with regard to which the taxpayer has timely filed a petition for redetermination. <u>See also</u> sec. 6214(b) (providing that in redetermining a deficiency for any taxable year, the Tax Court shall consider facts for other years as necessary to make that redetermination but in so doing "shall

**[*14]** have no jurisdiction to determine whether or not the tax for any other year * * * has been overpaid").

Since petitioners' claim of a business bad debt deduction allegedly arose in 2009, and the tax year at issue in this case is 2007, we lack jurisdiction to determine whether petitioners are entitled to a refund for 2009.

V.     Accuracy-Related Penalty

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662(a) and (b)(2) for an underpayment due to a substantial understatement of income tax. Section 6662(a) imposes a penalty of 20% of the portion of the underpayment to which the section applies. As outlined in the above discussion, we hold that petitioners did not have to report COD income for 2007 because there was no discharge of indebtedness regarding the SIC loan and the $20,000 discharge occurred when petitioners were insolvent. Accordingly, we find that petitioners had no underpayment. We therefore hold that petitioners are not liable for the accuracy-related penalty.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

[*15]  To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.