**L & C SPRINGS ASSOCIATES, Century Capital Corporation, and Tax Matters Partner, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 98–2970.

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1999.

Decided Aug. 18, 1999.

Randall G. Dick (argued), Jeffer, Mangels, Butler & Marmaro, San Francisco, CA, for Petitioners–Appellants.

Curtis C. Pett (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, for Respondent–Appellee.

Before RIPPLE, DIANE P. WOOD and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

The Internal Revenue Service determined adjustments to L & C Springs Associates' income tax returns; L & C Springs sought review in the United States Tax Court. The court ruled in the Commissioner's favor, and L & C Springs appealed that judgment to this court. For the reasons set forth in the following opinion, we affirm the judgment of the Tax Court.

## I

## BACKGROUND

### A. Tax Background

■ When a taxpayer sells property, the difference between the property's amount realized (generally the amount paid for the property upon sale) and the property's basis (generally the amount the seller originally paid) is included in the taxpayer's income. *See* I.R.C. § 1001. However, it does not take a sale to recognize income: Any "disposition" is sufficient. *See id.* For example, if a taxpayer abandons property, then the taxpayer is required by I.R.C. § 1001 to recognize any gain on the property. *See Middleton v.*

*Commissioner,* 77 T.C. 310, 320–21, 1981 WL 11281 (1981), *aff'd. per curiam,* 693 F.2d 124 (11th Cir.1982).

■ The specific gain triggered in this case is the cancellation of nonrecourse debt. It is well established that nonrecourse debt that finances land ownership is included in the taxpayer's basis in the land. *See Commissioner v. Tufts,* 461 U.S. 300, 305–06, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). In any disposition of land, a related cancellation of the taxpayer's indebtedness is included in the taxpayer's amount realized. *See id.;* 26 C.F.R. § 1.1001–2. Therefore, cancellation of indebtedness in an abandonment of property can generate income under I.R.C. § 1001. The issue in this case is *at what time* L & C Springs abandoned certain property, thereby triggering gain from debt cancellation for purposes of I.R.C. § 1001.

### B. Factual Background

Beginning in early 1980, Tanglewood Properties, Inc. ("Tanglewood") owned land in Florida ("L & C Properties"). Tanglewood's ownership was subject to a lien securing a debt that came to be owed to California Federal Savings and Loan Association ("California Federal").

L & C Springs purchased the land from Tanglewood in 1981. Part of the purchase agreement allowed L & C Springs to sell the property back to Tanglewood and to retain a 15–year leasehold interest in the land. L & C Springs exercised that option, which reduced the original purchase price to $2.45 million. In effect, then, Tanglewood had legal title to the land, and L & C Springs had a leasehold. L & C Springs financed the $2.45 million price with a seller-financed nonrecourse promissory note. The Tax Court found that the same parties controlled both Tanglewood and L & C Properties and that the transactions between the two entities were not carried on in an arm's length manner.[1]

---

1. In a footnote in its reply brief, L & C      Springs argues that there were other owners

Due to an economic downturn and a long-term inability to make a profit on the land, L & C Springs failed to make a $2.25 million balloon payment due on January 31, 1987, and never made any further payment on the note or payment of property taxes. Tanglewood, however, did not take any foreclosure action.

Because it was not receiving payments from L & C Springs, Tanglewood defaulted on its mortgage obligations to California Federal on July 1, 1989. On May 1, 1990, California Federal obtained a final judgment of foreclosure on L & C Properties. As part of the final judgment of foreclosure, all rental income from the L & C Properties was ordered to be turned over directly to California Federal, and a court-ordered sale of the L & C Properties was scheduled for May 24 and 29, 1990. In various foreclosure proceedings, Tanglewood represented that it owned the properties and did not disclose L & C Springs' interest in the property. L & C Springs did not report rental income on the property past November 1, 1990.

In May of 1990, before the foreclosure sale of L & C Properties, Tanglewood filed for bankruptcy in order to delay the foreclosure sale. In an October 1990 agreement, Tanglewood agreed with California Federal that it would dismiss the bankruptcy proceedings in exchange for California Federal's delay in the foreclosure sale of L & C Properties until after February 15, 1991. Under that October 1990 Agreement, management and control of L & C Properties were turned over to California Federal. A foreclosure sale eventually took place in mid–1991.

## C. The Tax Court's Opinion

The Tax Court found that the October 1990 Agreement effectively conveyed to California Federal L & C Springs' remaining 6–year leasehold interest and relieved L & C Springs of its obligation to Tangle-

of interests in L & C Springs besides those that controlled Tanglewood. However, L & C Springs never specifically disputes that, de-

wood on the nonrecourse note. The Tax Court held that this effective termination of L & C Springs' interest in the land was a recognition event under I.R.C. § 1001, so that L & C Springs recognized $2.25 million in income in 1990 from cancellation of its indebtedness to Tanglewood. The court rejected L & C Springs' argument that the abandonment took place in 1991, when the foreclosure sale of L & C Properties occurred.

The court's conclusion was based on a variety of factors that, in its view, indicated that California Federal had taken effective, yet not legal, title to the property. The October 1990 Agreement between Tanglewood and California Federal effectively transferred all rights and obligations of ownership to California Federal and relieved L & C Springs of its debt to Tanglewood and leasehold in L & C Properties. Indeed, in 1987, L & C Springs already had ceased making payments to Tanglewood on the debt and to the government on the property taxes. Only formal title was withheld from California Federal until 1991. Additionally, L & C Springs failed to claim rental income from the property after the October 1990 Agreement. These factors, concluded the Tax Court, indicate a complete abandonment of the property.

## II

## DISCUSSION

■ We review the Tax Court's factual determinations for clear error, but its legal conclusions de novo. *See Pittman v. Commissioner*, 100 F.3d 1308, 1312 (7th Cir. 1996).

## A.

■ L & C Springs submits that, for there to be an abandonment of property creating a "disposition" for purposes of

spite these nonoverlapping interests, the same parties had effective control over both L & C Springs and Tanglewood.

I.R.C. § 1001, there must be both an intent to abandon and an unmistakable and overt act of abandonment. L & C Springs argues that the October 1990 Agreement, upon which the Tax Court relied, cannot be evidence of L & C Springs' intent or of an overt act by L & C Springs because L & C Springs was not even a party to that agreement. Moreover, the Tax Court did not rely on any overt acts by L & C Springs, except failure to make payments on the debt. The actual time of abandonment occurred, contends L & C Springs, when the foreclosure sale occurred in 1991.

■■■ We agree with the Tax Court that the abandonment occurred in 1990. At the outset, we emphasize that it is firmly established that the determination of the existence or timing of an abandonment is inherently a factual matter that requires a practical examination of all of the circumstances. *See Davis v. Commissioner*, 241 F.2d 701, 703 (7th Cir.1957). The weight given to various factors must depend on the economic realities of the situation. For instance, when a taxpayer seeks to take a beneficial deduction because of an abandonment, an affirmative act on the part of the taxpayer is entitled to great weight because it provides some objective measure of the taxpayer's intent. *See, e.g., id.; Middleton v. Commissioner*, 77 T.C. 310, 322, 1981 WL 11281 (1981), *aff'd. per curiam*, 693 F.2d 124 (11th Cir. 1982). On the other hand, when the abandonment will result in the recognition of income, the taxpayer's unilateral activity is entitled to less weight because it might well be motivated by a desire to postpone the recognition of income. *See Brountas v. Commissioner*, 74 T.C. 1062, 1073–74, 1980 WL 4441 (1980). The proper test is whether, under the facts and circumstances, it is clear for all practical purposes that the taxpayer will not retain the property; an overt act of abandonment by the taxpayer is not necessary. *See Cozzi v. Commissioner*, 88 T.C. 435, 445–46, 1987 WL 49276 (1987).

The Tax Court was therefore correct in assessing the totality of the circumstances to determine when the abandonment took place. The Tax Court was not clearly erroneous in its determination that L & C Springs had abandoned the property in 1990. L & C Springs had failed to make a balloon payment, had failed to claim any rental income from the property as of November 1, 1990, and had not paid its property taxes. Given that the land had not produced a profit in many years, it was extremely unlikely that L & C Springs would concern itself with the extinguishment of its leasehold interest. In addition, under the October 1990 Agreement between Tanglewood and California Federal, California Federal took over the management and control of the property, effectively destroying any interest that L & C Springs had. The later passage of legal title by foreclosure sale was a mere formality. In these respects, this case is similar to *Cozzi*, in which the Tax Court held that abandonment occurred when it was clear that a venture would not turn a profit and the taxpayer made no effort toward payment of a debt; a later formal agreement extinguishing the taxpayer's interest did not establish the time of abandonment. *See id.* at 445–48, 1987 WL 49276.

We also cannot accept L & C Springs' argument that the Tax Court erred in relying on the October 1990 Agreement because L & C Springs was not a party to that agreement. Engaging in the pragmatic sort of assessment that is required under the governing principles, the Tax Court realistically concluded that, given the fact that the same parties controlled both Tanglewood and L & C Springs, "all individuals associated with L & C Springs and Tanglewood and the other entities involved in the transaction had for all intents and purposes ... treated L & C Springs as having no continuing substantive ownership interest in the L & C Properties." *L & C Springs Assocs. v. Commissioner*, 74 T.C.M. (CCH) 928, 934 (1997).

### B.

■■■ L & C Springs also contends that its interest in the property had not been

completely abandoned because it retained a "right of redemption" under Florida law. Pursuant to that right, L & C Springs could choose, after foreclosure, to purchase the property by paying a price higher than the foreclosure price. It relies upon *R. O'Dell & Sons Co. v. Commissioner*, 169 F.2d 247, 249 (3d Cir.1948), in which the Third Circuit held that the possibility of redemption delayed the recognition of gain.

In the end, we believe that this contention must be governed by the same guiding principle articulated in our earlier discussion: The duty of the Tax Court was to focus on the practical realities of the transaction rather than the formalities. At the outset, we note that the Tax Court raised a substantial doubt as to the continued existence of the right of redemption that L & C Springs now asserts. The Tax Court was of the view that any such right of redemption had been waived under an agreement in 1981. L & C Springs offers no adequate rebuttal to that assertion.[2] More fundamentally perhaps, whatever right of redemption a mere lessee might retain under Florida law is a subordinate interest to that held by the lessor; extinguishment of the latter extinguishes the former. *See Riley v. Grissett*, 556 So.2d 473, 475 (Fla.Dist.Ct.App.1990). Viewing the economic substance of the situation facing L & C Springs, it is clear that *O'Dell* is not controlling and the Tax Court was on solid ground in concluding that there was no realistic possibility that L & C Springs could exercise any right of redemption that might remain. The same individuals controlled Tanglewood and L & C Springs. The Tax Court found that, through the October 1990 Agreement, those individuals had agreed to give control and management of the property to California Federal. The Tax Court also found that no additional funding was available and that the individuals concerned

knew that no further funds would become available. They agreed that no right of redemption would be exercised. Moreover, because the debt was nonrecourse, L & C Springs' relinquishment of the property relieved it of any debt it owed.

### Conclusion

In *Commissioner v. Court Holding*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945), Justice Black reminded us that to allow the true nature of a transaction to be disguised by mere formalisms is to run the risk of impairing seriously the effective administration of tax policies established by Congress. In *Diedrich v. Commissioner*, 457 U.S. 191, 194–95, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982), the Court emphasized the importance of this principle with respect to discharge of indebtedness income. Here, the Tax Court heeded well the Supreme Court's admonition in determining that L & C Springs did not have any real economic interest in the property after the October 1990 Agreement.

For the foregoing reasons, the judgment of the Tax Court is affirmed.

AFFIRMED.

---

**2.** L & C Springs submits that the waiver applied only to the right of redemption under Illinois law. However, the text of the 1981 agreement indicates that the waiver was not limited in this way.