T.C. Memo. 2006-118

UNITED STATES TAX COURT

TIMOTHY J. COBURN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6695-04.                    Filed June 8, 2006.

<u>Richard A. Siegal</u> and <u>Mark S. Gregory</u>, for petitioner.

<u>Michael J. Proto</u>, for respondent.

MEMORANDUM OPINION

WELLS, <u>Judge</u>:  The instant matter is before the Court on
petitioner's motion for litigation fees and costs pursuant to
section 7430 and Rule 231.  The issues to be decided are whether
respondent's position in the court proceeding was substantially
justified and whether the litigation costs petitioner claims are

reasonable.  Unless otherwise indicated, all section references
are to the Internal Revenue Code, and all Rule references are to
the Tax Court Rules of Practice and Procedure.

### Background

The parties have not requested a hearing on the instant
motion.  Consequently, we base our decision on the parties'
submissions and the record.  The underlying facts of this case
are set forth in detail in Coburn v. Commissioner, T.C. Memo.
2005-283 (Coburn I), and we incorporate by reference the portions
of Coburn I that are relevant to our disposition of the instant
motion.  The following represents a brief summary of the factual
and procedural background of the instant case.

At the time of filing the petition, petitioner resided in
Glastonbury, Connecticut.  During 1996, petitioner received stock
of PhyMatrix Corp. (PhyMatrix) and CareMatrix Corp. (CareMatrix)
with an aggregate value of $1,675,000, and petitioner incurred a
related income tax liability of $621,980.  On April 15, 1997,
CareMatrix lent petitioner $621,980, and petitioner pledged
57,248 shares of PhyMatrix common stock (the collateral) as
security on the loan.[1]  To complete the loan transaction,
petitioner executed a promissory note (the promissory note), a
stock pledge agreement (the stock pledge agreement), and a stock

---

[1]Petitioner concedes that the purpose of the loan was to
provide him with the money necessary to pay the aforementioned
income tax liability.

transfer power (the stock transfer power).  The promissory note, stock pledge agreement, and stock transfer power are collectively referred to as the loan documents.

The promissory note became due and payable on April 15, 2000.  CareMatrix subsequently demanded payment, but petitioner refused to pay on grounds that the promissory note was nonrecourse and that CareMatrix held the collateral.  CareMatrix made no further collection efforts.

Respondent determined that petitioner's default on the promissory note resulted in cancellation of indebtedness income of $750,000 in 2000 and that petitioner was liable for an income tax deficiency of $277,951 and a section 6662 accuracy-related penalty of $55,590.20 for that year.  Petitioner timely petitioned this Court for a redetermination.  The parties submitted the case fully stipulated, without trial, pursuant to Rule 122.  In Coburn I, we held that petitioner did not realize discharge of indebtedness income in 2000 and that petitioner is not liable for a section 6662 accuracy-related penalty.  On January 17, 2006, petitioner filed the instant motion for award of litigation costs of $94,860.81.

## Discussion

Section 7430(a) provides that a taxpayer may recover litigation costs incurred in a court proceeding brought against the United States in connection with the determination of a tax

or penalty.  Litigation costs may be awarded pursuant to section 7430 if (1) the taxpayer has exhausted administrative remedies, (2) the taxpayer has not unreasonably protracted the court proceedings, (3) the taxpayer is the prevailing party, and (4) the claimed litigation costs are reasonable.  Sec. 7430(a), (b)(1), (3), (c)(4).  Respondent concedes that petitioner exhausted all administrative remedies and did not unreasonably protract the court proceedings.  We must decide whether petitioner is the prevailing party and whether the amount of petitioner's claimed litigation costs is reasonable.

Prevailing Party

To qualify as the prevailing party pursuant to section 7430(c)(4)(A), the taxpayer must substantially prevail with respect to either the amount in controversy or the most significant issue or set of issues presented, and the taxpayer must satisfy the net worth requirement of section 7430(c)(4)(A)(ii).[2]  Respondent concedes that petitioner substantially prevailed with respect to the amount in controversy and the most significant issue presented and that petitioner satisfies the net worth requirement.

---

[2]Sec. 7430(c)(4)(A)(ii), as relevant here, effectively limits the award of litigation costs to individuals with a net worth of $2 million or less.  Stieha v. Commissioner, 89 T.C. 784, 789-790 (1987).

Notwithstanding a taxpayer's satisfaction of the prevailing party requirements of section 7430(c)(4)(A), section 7430(c)(4)(B)(i) provides that a taxpayer is not treated as the prevailing party if the United States establishes that its position in the court proceeding was substantially justified. Accordingly, the Commissioner has the burden of proof on the issue of whether the Commissioner's position was substantially justified. To be considered substantially justified, the Commissioner's position must be justified to a degree that could satisfy a reasonable person and must have a reasonable basis in both law and fact. Corkrey v. Commissioner, 115 T.C. 366, 373 (2000). In deciding whether the Commissioner acted reasonably, we consider both the basis for the Commissioner's legal position and the manner in which the position was maintained. Id. at 373. The mere fact that the Commissioner loses a case does not establish that the Commissioner's position was unreasonable, but the loss of the case may be considered as a factor. Maggie Mgmt. Co. v. Commissioner, 108 T.C. 430, 443 (1997).

Generally, the Commissioner's position in a court proceeding is established in the Commissioner's answer to the petition. See Huffman v. Commissioner, 978 F.2d 1139, 1148 (9th Cir. 1992), affg. in part, revg. in part and remanding T.C. Memo. 1991-144; Maggie Mgmt. Co. v. Commissioner, supra at 442. In the instant case, the petition in relevant part states that the

"determination of the income tax and penalty set forth in the notice of deficiency is based upon an erroneous determination that the debt was forgiven by * * * [CareMatrix] during 2000."[3] Respondent's answer to the petition responded as follows: "Denies; alleges that the respondent determined a deficiency and a penalty in income tax." We understand respondent's position in the answer to be that petitioner realized discharge of indebtedness income from forgiveness of indebtedness of $750,000 in 2000 and that petitioner is liable for an income tax deficiency of $277,951 and a section 6662 accuracy-related penalty of $55,590.20.[4]

We now turn to our analysis of whether respondent has proved that respondent's legal position was substantially justified. We base our analysis on the facts and legal precedents which formed the basis of that position. See Maggie Mgmt. Co. v. Commissioner, supra at 443. Relying on Cozzi v. Commissioner, 88 T.C. 435, 445 (1987), respondent contends in the instant motion that a debt is viewed as having been discharged the moment that it becomes clear that the debt will never have to be paid and

---

[3]The notice of deficiency's explanation of adjustments in relevant part states: "It is determined that $750,000.00 from the discharge of indebtedness (commonly referred to as COD income) by CareMatrix is includible in income. Accordingly, taxable income is increased $750,000.00 for the tax year ended December 31, 2000."

[4]We note that the parties do not dispute that the loan from CareMatrix constitutes bona fide indebtedness.

that the moment is determined by applying a facts and circumstances analysis. On the basis of the following facts, respondent contends that a reasonable person could conclude that no expectation of repayment remained after petitioner's refusal to pay in 2000, and, consequently, that respondent's position was substantially justified: (1) A "unique relationship" existed between petitioner and CareMatrix as demonstrated by the loan to cover petitioner's income tax liability; (2) the terms of the loan documents on their face provide for a recourse liability; (3) petitioner had made no payment as of April 15, 2000; (4) petitioner abandoned the collateral in 2000; (5) CareMatrix took no action to collect the liability in 2000, either by selling the collateral or by commencing an action against petitioner,[5] and (6) nearly 4 years passed from the date on which the promissory note became due and payable until the date on which respondent issued the notice of determination.

_____

[5]Specifically, respondent's response to the instant motion states that respondent's position was substantially justified on the basis of, inter alia, the following facts:

> f. The note became due in 2000, [petitioner] did not perform on the note, and [CareMatrix] did not take advantage of any of the aforementioned recourse provisions available to it.

> g. Upon petitioner's default, [CareMatrix] did not foreclose or otherwise take legal title in the collateral.

We agree with respondent that a debt is discharged when it becomes clear that the debt will never have to be paid and that a facts and circumstances analysis is applied to determine the timing of the discharge.  Cozzi v. Commissioner, supra at 445. We do not agree, however, that respondent's legal position was reasonable on the basis of the facts and legal precedents which formed the basis of that position.

We note, however, that respondent's position in the instant proceedings was not based on the absence of collection activities by CareMatrix after 2000, the year in issue.[6]  The test for determining the time of discharge requires a practical assessment of the facts and circumstances relating to the likelihood of repayment.  Id.  Facts and circumstances after 2000 were unavailable for assessing the likelihood of repayment during 2000.  Accordingly, in deciding whether respondent's position was substantially justified, we do not consider any acts or omissions of CareMatrix after 2000, the year of the alleged discharge.  See Maggie Mgmt. Co. v. Commissioner, supra at 443.

Moreover, while respondent's position at trial, as stated in respondent's trial memorandum, was that the liability was

_____

[6]Specifically, respondent contends that the "passage of nearly four years between the note's maturity and the issuance of the notice of deficiency, allowed the reasonable conclusion that, at the time respondent filed his answer to the petition, there was no 'likelihood of payment'".  Below, we separately address the absence of collection activities during 2000, the year in issue.

nonrecourse, respondent's position in the answer was not based on the fact now alleged in respondent's response to the instant motion that the loan documents on their face provide for a recourse liability. Respondent's answer did not address the issue of whether the liability was recourse or nonrecourse. Even though respondent's trial memorandum took the position that the liability was nonrecourse, respondent's opening brief contended that the Federal income tax result in the instant case does not depend on whether the loan is recourse or nonrecourse.[7] Clearly, as we noted in Coburn I, respondent has not been of one mind concerning the facts of the instant case. In deciding whether respondent's position was substantially justified, we will not consider the fact now alleged in respondent's response to the instant motion, that the loan documents on their face provided for a recourse liability. See id.

With respect to the "unique relationship" of petitioner and CareMatrix now alleged by respondent, we understand respondent to contend that CareMatrix discharged the liability on account of either mutual interests with petitioner or sympathy for him. We recognize that the facts demonstrate the existence of an interrelationship among petitioner, CareMatrix, and PhyMatrix:

---

[7]Although respondent contended that the Federal income tax result in the instant case does not depend on whether the liability is recourse or nonrecourse, respondent's opening brief disputed petitioner's contention that the liability was nonrecourse.

During 1996, petitioner received stock of CareMatrix and PhyMatrix valued in the aggregate at $1,675,000; Abraham D. Gosman served as chief executive officer and chairman of the board of CareMatrix at all relevant times and appears to have simultaneously served as chief executive officer and chairman of the board of PhyMatrix;[8] CareMatrix advanced a loan to petitioner for the purpose of covering petitioner's income tax liability incurred in relation to petitioner's receipt of the CareMatrix and PhyMatrix stock; and the loan from CareMatrix was secured solely by petitioner's PhyMatrix stock. However, despite the evidence of that interrelationship, respondent conceded that the loan constituted bona fide indebtedness and offered no evidence to the contrary. Respondent chose to submit the instant case fully stipulated without trial rather than placing the issue of the bona fides of the CareMatrix loan before the Court and questioning the intent of petitioner and CareMatrix at trial. Given respondent's concession, and absent the raising of the issue of the bona fides of the loan, we will not consider the facts relating to the interrelationship among petitioner, CareMatrix, and PhyMatrix for the purpose of the instant motion.

---

[8]Abraham D. Gosman appears to have signed the stock certificate for the collateral as chairman, president, and chief executive officer of PhyMatrix. The stock certificate was dated May 19, 1997. The record contains no further evidence with respect to the relationship of Abraham D. Gosman and PhyMatrix.

As we held in Coburn I, regardless of whether the liability in the instant case is nonrecourse or recourse, petitioner's default on the loan and abandonment of the collateral in 2000 did not result in petitioner's realizing discharge of indebtedness income in 2000. In Coburn I, we held that, if the loan were nonrecourse, any income realized upon petitioner's loan default and abandonment of collateral in satisfaction of the liability would constitute gain on the sale or other disposition of the collateral pursuant to section 1001(a) rather than discharge of indebtedness income. See L&C Springs Associates v. Commissioner, 188 F.3d 866, 868 (7th Cir. 1999), affg. T.C. Memo. 1997-469; sec. 1.1001-2(a)(1), Income Tax Regs. We also held, alternatively, that, if the loan were recourse, petitioner's loan default and abandonment of collateral, alone, would not discharge the underlying liability because the collateral would not represent the only source of repayment of the loan. See Lockwood v. Commissioner, 94 T.C. 252, 260 (1990).

Moreover, in Coburn I, we held that, regardless of whether the liability is nonrecourse or recourse, the absence of action by CareMatrix to collect the liability in the year of default did not result in petitioner's realizing discharge of indebtedness income in 2000. With respect to nonrecourse indebtedness, the liability was satisfied upon petitioner's abandonment of the collateral to CareMatrix. See L&C Springs Associates v.

Commissioner, supra at 868; Carlins v. Commissioner, T.C. Memo. 1988-79. Consequently, no collection activity was necessary. With respect to recourse indebtedness, CareMatrix could take action to collect the liability in a subsequent year. Upon a default by petitioner, the stock pledge agreement provided that CareMatrix could sell the collateral and apply the proceeds toward the payment of the loan, and the loan documents did not preclude the commencement of an action by CareMatrix to recover directly from petitioner. However, neither the loan documents nor Massachusetts law required that such a collection action be commenced during the year of default. On the contrary, the promissory note expressly provided that a delay by CareMatrix did not constitute a waiver of its rights:

> [CareMatrix] shall not, by any act, delay, omission or otherwise be deemed to waive any of its rights or remedies hereunder unless such waiver be in writing and signed by * * * [CareMatrix], and then only to the extent expressly set forth therein.

Respondent made no contention and offered no evidence that CareMatrix affirmatively waived its right to payment from petitioner. Additionally, the period of limitations for CareMatrix to commence an action to enforce petitioner's repayment did not expire until April 15, 2006.[9] See Mass. Gen. Laws ch. 106, sec. 3-118 (1998 & Supp. 2005). Consequently, if

---

[9]State statutes of limitation are of evidentiary value as to the timing of the realization of income. Policy Holders Agency, Inc. v. Commissioner, 41 T.C. 44, 49 (1963).

the loan were recourse, the absence of any action by CareMatrix during 2000 to collect the liability would in no way preclude CareMatrix from commencing such a collection action after 2000. Because CareMatrix had not forfeited its right to payment as of the close of 2000, an expectation of repayment remained.

In addition to the aforementioned facts, respondent relied on the precedent of Cozzi v. Commissioner, 88 T.C. 435 (1987). In Cozzi v. Commissioner, supra at 437, a limited partnership, Hap Production Co. (debtor), was formed to provide services related to the production of motion picture films, and the taxpayers invested in the debtor as limited partners.[10] In 1975, the debtor received a nonrecourse loan from Sargon Etablissement (lender). Id. at 438. The debtor agreed to repay principal and interest under a repayment schedule ending in 1980. Id. As security for the nonrecourse loan, the lender retained a first position lien in all proceeds generated under a motion picture production agreement between the debtor and Map Films, Ltd. (the production agreement).[11] Id. The production agreement

---

[10]In Cozzi v. Commissioner, 88 T.C. 435, 447 (1987), we stated, "The record makes clear that Hap was a tax shelter which generated significant tax benefits".

[11]Pursuant to the production agreement, the debtor agreed to perform certain services related to the production of a motion picture in return for the payment of $1,160,000 and certain costs incurred by the debtor. Cozzi v. Commissioner, supra at 437.

represented the lender's sole security on the loan.  See id. at 439.

The debtor made no payment and engaged in no communication with the lender with respect to the loan during 1977, 1978, 1979, 1980, and 1981.  Id. at 439-440.  The Commissioner contended that the production agreement became worthless and was abandoned by the debtor in 1980, that the debtor was released from the debt in 1980, and that the debtor realized income as a result of that release.  Id. at 446.  The taxpayers conceded that an abandonment of the production agreement would result in ordinary income but contended that the production agreement did not lose its value and that the debtor did not abandon the production agreement in 1980.  Id.  Applying a facts and circumstances analysis, we held that the production agreement had become worthless as of 1980, that the debtor had no intention of enforcing its rights under the production agreement, and that the lender had no intention of enforcing its rights against the debtor under the loan agreement. Id. at 446-447.  We further held that the failure of the debtor to make the scheduled final payment to the lender in 1980 constituted an "identifiable event" evidencing the debtor's abandonment of the worthless production agreement.  Id. at 447. We concluded that the abandonment by the debtor demonstrated that the discharge occurred in 1980 as asserted by the Commissioner.  Id. at 445-448.

In the instant case, respondent confused both the facts and the holding of Cozzi.  Respondent's trial memorandum stated as follows:

> I.R.C. § 61(a)(12) provides that gross income includes income from discharge of indebtedness.  On April 15, 2000, when petitioner's liability for a loan from CareMatrix for $621,980 plus interest of $128,080 (total of $750,000,) became due, petitioner defaulted.  Petitioner had executed a non-recourse promissory note, and the only collateral for the loan involved petitioner's 57,248 shares of common stock of PhyMatrix.  CareMatrix opted not to take those shares of stock pursuant to the default.

> In Cozzi v. Commissioner, 88 T.C. 435 (1987), the lender abandoned the loan's security due to its nominal value.  The Court determined that there was income from discharge of indebtedness income in that situation, stating:  "The moment it becomes clear that a debt will never have to be paid, such debt must be viewed as having been discharged."  Id. at 445.

> Thus, petitioner received $750,000 in income from discharge of indebtedness for the year 2000 pursuant to section 61(a)(12).

Respondent's trial memorandum therefore suggests that Cozzi, stands for the proposition that a debtor realizes discharge of indebtedness income upon the lender's abandonment of collateral securing a nonrecourse loan.  Respondent's opening brief also cites Cozzi, for the proposition that a lender's abandonment of collateral securing a nonrecourse loan results in discharge of indebtedness income to the borrower, and the opening brief argues at length that CareMatrix abandoned the collateral in 2000. Respondent's reply brief summarizes respondent's position as follows:  "In sum, * * * [CareMatrix] ignored all of its rights

and remedies under the Note and abandoned the collateral in 2000. Such abandonment was the 'identifiable event' that made it clear [petitioner] would not have to repay his obligation to * * * [CareMatrix]. As a result, * * * [petitioner] realized discharge of indebtedness income of $750,000 in 2000."

In Cozzi v. Commissioner, supra at 445-447, however, we held that the abandonment of the collateral by the debtor--not the lender--evidenced the moment of discharge. The lender could not have abandoned the collateral because the lender never exercised control over the production agreement. Id. at 440 ("During * * * [the years 1977, 1978, 1979, 1980, and 1981], * * * [the debtor] did not take any action to cause the collateral securing the debt to * * * [the lender] to be conveyed to * * * [the lender]."). Even if the lender exercised control over the collateral upon the debtor's abandonment in 1980, a borrower's abandonment of the sole collateral securing a nonrecourse loan terminates the debt, and the income tax consequences to the borrower are determined at the time of the termination.[12] See L&C Springs Associates v. Commissioner, 188 F.3d at 868; Carlins v. Commissioner, T.C. Memo. 1988-79. Consequently, any

---

[12]We note that the actions of the lender with respect to the loan might, as in Cozzi v. Commissioner, 88 T.C. at 446-447, evidence the debtor's abandonment of the collateral by demonstrating the collateral's worthlessness.

subsequent abandonment of the collateral by the lender would have no Federal income tax consequences for the debtor.

Moreover, as we noted in Coburn I, Cozzi v. Commissioner, 88 T.C. 435 (1987), is of limited precedential value under the facts of the instant case. The parties in Cozzi did not dispute whether the abandonment of collateral results in gain on the sale or other disposition of property or in discharge of indebtedness income, and, consequently, the Court did not address the issue.

On the basis of the foregoing, we conclude that respondent's position did not have a reasonable basis in either law or fact. Additionally, respondent failed to maintain that position with consistency and accuracy throughout the instant proceedings. Accordingly, we hold that, for purposes of section 7430(c)(4)(B)(i), respondent has failed to establish that respondent's position was substantially justified. We now turn to our analysis of whether the amount of litigation costs petitioner seeks is reasonable.

Reasonable Litigation Costs

"Reasonable litigation costs" include reasonable court costs and reasonable fees paid or incurred for the services of attorneys in connection with the court proceeding. Sec. 7430(c)(1)(A), (B)(iii). Pursuant to section 7430(c)(1), the amount of attorney's fees that may be awarded is limited to a statutorily prescribed amount, as adjusted for inflation. For

purposes of the instant motion, the inflation-adjusted statutory rate is $150 per hour.  See Rev. Proc. 2003-85, sec. 3.33, 2003-2 C.B. 1184, 1190; Rev. Proc. 2004-71, sec. 3.35, 2004-2 C.B. 970, 976.  Attorney's fees, however, may be awarded at a higher rate if justified by a special factor such as the limited availability of qualified attorneys, the difficulty of the issues presented in the case, or the local availability of tax expertise.  Sec. 7430(c)(1)(B)(iii).  Petitioner bears the burden of proving that claimed litigation costs are reasonable for purposes of section 7430(c)(1).  See Rule 232(e).

Petitioner seeks to recover the following attorney's fees:[13]

| Attorney | Hours | Rate | Amount Billed |
|----------|-------|------|---------------|
| Mark S. Gregory | 36.7 | $496.39 | $18,217.50 |
| Richard Siegal | 92.2 | 439.91 | 40,560.00 |
| D. W. Knight-Brown | 66.0 | 381.43 | 25,174.50 |
| Jeffrey A. Letalien | 6.1 | 220.00 | 1,342.00 |
| Kelley Galica-Peck | 7.3 | 395.00 | 2,883.50 |
| Total | 208.3 | | 88,177.50 |

Respondent contends that any award of attorney's fees should be limited to the statutory rate of $150 per hour on grounds that no special factor justifies a higher rate.  Petitioner contends that the aforementioned rates are justified because (1) the attorney's fees are based on the standard hourly rates charged by

_____

[13]Remaining fees that petitioner seeks to recover in the instant motion do not constitute attorney's fees for purposes of sec. 7430(c)(1)(B)(iii) and are, therefore, treated as court costs.  Respondent's objection to the court costs petitioner seeks are addressed below.

petitioner's attorneys; (2) the hourly rates charged by petitioner's attorneys are consistent with the hourly rates prevailing in the community for the type of work involved, as demonstrated by the affidavits of Connecticut tax attorneys Samuel M. Hurwitz and Mark G. Sklarz; (3) petitioner's attorneys possessed expertise in both tax law and relevant Massachusetts commercial law; (4) the representation of petitioner was made more difficult by respondent's changing legal theory during the court proceeding; (5) the effectiveness of petitioner's representation is demonstrated by the Court's holding in Coburn I; and (6) respondent rejected numerous offers from petitioner to settle the matter.

We conclude that petitioner has not established that there was a limited availability of qualified attorneys for the instant proceedings, that there was a limited availability of tax expertise, or that the issues presented in Coburn I were of sufficient difficulty to qualify as a special factor under section 7430(c)(1)(B)(iii). Accordingly, we limit the award of the aforementioned attorney's fees to the statutory rate of $150 per hour.

Finally, we turn to our analysis of whether the amount of costs petitioner seeks is reasonable. Those claimed costs include (1) fees of $608.50 for the services of paralegals, clerks, and law clerks and (2) disbursements of $6,074.81.

Respondent disputes the award of costs for certain disbursements that respondent contends petitioner did not adequately describe. Rule 231 provides that a party claiming litigation costs for which the parties have not reached an agreement must file a written motion that includes a statement of the specific litigation costs claimed and a supporting affidavit setting forth the nature and amount of each item. Rule 231(a)(2), (b), (d). Petitioner timely filed a motion with this Court in compliance with Rule 231. With the motion, petitioner filed the supporting affidavit of his attorney Richard A. Siegal and a detailed billing record (the billing record) identifying each "out-of-pocket disbursement" billed to petitioner with respect to the instant proceedings.[14] The billing record chronologically sets forth the date and amount of each disbursement and identifies each disbursement with a numeric code. The billing record separately describes each numeric code. For instance, the billing record sets forth a disbursement of $461.66 on February 8, 2005, and identifies the disbursement with the numeric code "00256". Separately, the billing record describes the numeric code "00256" as "Lexis Research".[15] On the

---

[14]Petitioner also filed an additional affidavit in compliance with Rule 232(d).

[15]As noted above, respondent generally contends that petitioner's descriptions of the claimed costs were inadequate. With respect to this example, respondent contended that

(continued...)

basis of the foregoing, we conclude that the billing record sufficiently describes the nature and amount of each item of costs petitioner claims.  Respondent makes no further objections. Consequently, we hold that the litigation costs petitioner claims are reasonable.[16]

In conclusion, we hold that petitioner is entitled to an award of reasonable litigation costs of $37,928.31, including attorney's fees of $31,245 and costs of $6,683.31.

To reflect the foregoing,

<u>An appropriate order will be issued.</u>

---

[15](...continued) petitioner provided no description.  As explained above, however, the description of those charges is evident upon a careful review of the billing record.

[16]Respondent's response to petitioner's motion for an award of litigation costs states:  "Unless already stated above, respondent has no additional disagreement with other allegations in the motion."