T.C. Memo. 2021-5

UNITED STATES TAX COURT

MICHAEL HOHL AND JENNIFER PARKER HOHL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BRADEN B. BLAKE AND KRISTEN S. BLAKE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4489-16, 4493-16.          Filed January 13, 2021.

Paul W. Jones, for petitioners.

Rebekah A. Myers, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, Judge:  Michael Hohl, Braden Blake, and James Bowles were

partners in a partnership from which they reported guaranteed payments.  A fourth

partner, Eduardo Rodriguez, regularly infused money into the partnership, which

[*2] the partnership and the partners generally treated as loans. For 2012, the year the partnership ceased operation, the partners treated Mr. Rodriguez' loans as contributions, and the partners were not called on to repay their respective shares of the loans. The Commissioner issued notices of deficiency to the partners determining cancellation of indebtedness income for 2012. Because the funds provided by Mr. Rodriguez were loans to the partnership, and the partnership's liability was allocated among the partners, the cancellation of those loans resulted in income to the partners.

## FINDINGS OF FACT

### I.      The Parties and the Formation of Echo

The Hohls lived in Utah and the Blakes lived in Washington State when they filed their petitions.

In 2009, Mr. Hohl and Mr. Blake, along with Mr. Bowles[1] and Mr. Rodriguez, formed Echo Mobile Marketing Solutions, LLC (Echo). Echo was in the business of text message advertising. Mr. Hohl, Mr. Blake, and Mr. Bowles conceived of the business, and Mr. Rodriguez provided capital. Mr. Hohl handled

---

[1]Mr. Bowles also has a case before this Court at docket No. 4494-16 involving the same partnership underlying these consolidated cases. Mr. Bowles' case was previously consolidated with these cases. On April 15, 2019, Mr. Bowles agreed to be bound by the outcome of these cases as to the issue of cancellation of indebtedness. The Court severed his case that same day.

**[*3]** sales, marketing, bookkeeping, and product development. Mr. Blake handled web and other development work. Mr. Bowles provided sales and marketing services.

Echo's partners entered into an operating agreement that set forth their capital contributions and percentage partnership interests. That agreement stated that Messrs. Hohl, Blake, and Bowles each contributed no money and owned a 30% interest in Echo, and that Mr. Rodriguez contributed $265,000 in exchange for a 10% interest.[2] It provided that the partners' capital accounts would be established and maintained in accordance with section 1.704-1(b)(2)(iv), Income Tax Regs. And it provided a formula for allocating the profits and losses of the business among the partners on the basis of their capital accounts. The agreement also provided for nondilution rights in the event additional capital was needed. If the partnership needed capital, it was required to notify all partners in writing to give them equal opportunity to contribute. The partners considered the arrangement to be a 30-30-30-10 split. At trial, Mr. Hohl, Mr. Blake, and Mr. Bowles each testified that they understood themselves to each own 30% interests and Mr. Rodriguez to own a 10% interest. The partners shared annual losses according to these percentage interests.

---

[2]All monetary amounts are rounded to the nearest dollar.

[*4] Over the life of the partnership, 2009 through 2012, Mr. Rodriguez repeatedly provided funds to the partnership. Mr. Hohl, who did the bookkeeping for Echo, recorded a total of $653,506 received from Mr. Rodriguez as loans to Echo. The partners intended to repay those amounts to Mr. Rodriguez.

II.  Tax Reporting

A.  2009

Echo filed a Form 1065, U.S. Return of Partnership Income, for 2009. It reported gross receipts of $1,214 and deductions of $46,549 resulting in a net loss of $45,335. The deductions consisted primarily of guaranteed payments to the partners. Echo's balance sheet showed a liability under the line item "Other liabilities" of $345,366, which it described on the required attachment as "NOTE PAYABLE--MEMBER." This liability matches the entire amount provided by Mr. Rodriguez in 2009, including the $265,000 listed in the operating agreement as a capital contribution.

On the accompanying Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., the loss and the liability (which was reported as a recourse liability) were allocated 30% to Mr. Hohl, 30% to Mr. Blake, 30% to Mr. Bowles, and 10% to Mr. Rodriguez. None of the partners' Schedules K-1, including Mr. Rodriguez', reported any initial capital account balances. Each

[*5] partner reduced his capital account by his share of Echo's loss for the year, resulting in negative capital accounts.

Mr. Hohl and his spouse filed a joint Form 1040, U.S. Individual Income Tax Return, for 2009. On Schedule E, Supplemental Income and Loss, the Hohls reported the $13,600 loss that Echo allocated to Mr. Hohl and the $15,061 guaranteed payment Echo made to him. They reported net partnership income of $1,461.

The Blakes also filed a joint Form 1040 for 2009.[3] On Schedule E, the Blakes reported the $13,600 loss that Echo allocated to Mr. Blake and the $14,800 guaranteed payment Echo made to him. They reported net partnership income of $1,200.

B. 2010

Echo reported a loss again for 2010. A loss of $379,739 arose largely from Echo's deduction of $297,120 of guaranteed payments made to its partners. Echo's balance sheet showed an increase in liabilities, bringing the total note payable--member amount to $564,322. The increase in the liability reflected an additional $218,956 infusion from Mr. Rodriguez in 2010.

---

[3]They later filed an amended return to claim itemized deductions.

[*6]    The allocation of Echo's items as reported on the 2010 Schedules K-1 differed slightly but significantly from that of 2009.  Echo allocated the loss in the same percentages for the previous year.  However, Echo allocated the liability 100% to Mr. Rodriguez.  Each partner's capital account balance again decreased by the partner's allocation of loss.

The Hohls and the Blakes each filed joint Forms 1040 for 2010.  They reported their guaranteed payments ($113,020 and $70,735, respectively) and their 30% shares of Echo's loss ($113,922 each), resulting in their reporting of net partnership losses of $902 and $43,187, respectively.  They each checked "No" in box 27 on their Schedules E, indicating that they were not reporting any losses disallowed for previous years because of, for example, basis limitations.

C.    2011

In 2011, Echo reported a $168,960 loss, $155,922 of which arose from the guaranteed payments.  The liability representing Mr. Rodriguez' loans increased by $75,000 to a total of $639,322.

The Schedules K-1 for 2011 closely followed those from 2010.  Consistent with those Schedules K-1, the Hohls and the Blakes reported their guaranteed payments ($57,320 and $39,985, respectively) and their 30% shares of Echo's loss ($50,688 each).  Neither of them reported a share of the liability, and each of them

[*7] decreased his capital account by his allocation of Echo's loss. The partnership allocated to Mr. Rodriguez his 10% share of the loss and 100% of the recourse liability.

D.      2012

Echo's 2012 Form 1065 was marked as its final return. Echo reported no income, deductions, losses, or guaranteed payments. Echo's liability increased by $14,184, to $653,506, but unlike past years' liabilities the amount was recorded as "Loans from partners", not as "Other liabilities."

The Schedules K-1 for 2012 reflected Echo's limited operations that year. Echo did not allocate any income, losses, deductions, or guaranteed payments to Mr. Hohl, Mr. Blake, or Mr. Bowles. Their Schedules K-1 each reported negative capital account balances, unchanged from 2011, of $178,210. Mr. Rodriguez' Schedule K-1 reported a negative capital account balance of $59,404, but no longer reported any share of partnership liabilities.

Both Mr. Blake and Mr. Hohl filed joint Forms 1040 for 2012; however neither reported any income or loss from Echo.

In summary, Echo's 2012 return showed a liability remaining on its balance sheet of $653,506, but no partner reported an allocation of any share of that liability. The partnership did not report any income, such as income from the

**[*8]** discharge of indebtedness, nor did Echo allocate to any partner any share of any such income. Mr. Hohl and Mr. Blake reported no partnership income for 2012.

III.    Examination and Petition

The Internal Revenue Service (IRS) examined the Hohls' and the Blakes' 2012 returns. On November 23, 2015, the IRS mailed the Hohls and the Blakes notices of deficiency determining deficiencies and accuracy-related penalties for 2012. The Commissioner has since conceded the penalties. In each notice the Commissioner adjusted the taxpayer's Schedule E income upward by $178,210, the amount of the partner's negative capital account balances, representing the partner's share of cancellation of indebtedness income. The explanation of the adjustment stated: "It is determined that your share of income from the partnership known as Echo Mobile Marketing for taxable year 2012 is $178,210.00 instead of $0.00 as reported on your return. Therefore, taxable income is increased $178,210.00 for tax year ended December 31, 2012." Each couple timely filed a petition with our Court.

**[*9]**                                          OPINION

I.      Jurisdiction and Burden of Proof

We have jurisdiction to redetermine the Commissioner's determinations, as set forth in a notice of deficiency, when a taxpayer files a timely petition challenging those determinations.[4]  Generally, the Commissioner's determinations in a notice of deficiency are presumed correct and the taxpayer bears the burden of proving otherwise.[5]  Which party bears the burden of proof is relevant only in the event of an evidentiary tie or a failure of proof.[6]

Although our jurisdiction to redetermine a deficiency is limited to the year set forth in the notice of deficiency, we may "consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency."[7]  The Hohls and the Blakes timely filed petitions challenging the deficiencies determined by the Commissioner for 2012.  We have

---

[4]Sec. 6213(a).  Echo had four partners, all of whom are individuals, and accordingly is subject to deficiency procedures.  See sec. 6231(a)(1)(B)(i).  All section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[5]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[6]Vandenbosch v. Commissioner, T.C. Memo. 2016-29, at *11.

[7]Sec. 6214(b).

**[\*10]** jurisdiction to determine the correct amount of any tax deficiencies for 2012, but we may consider relevant facts from other years.

II.     Mr. Rodriguez' Deposits

Before we decide whether the partnership recognized cancellation of indebtedness income, we must decide whether Mr. Rodriguez provided Echo loans or capital contributions. The Hohls and the Blakes argue that Mr. Rodriguez provided capital contributions. For this contention, they cite the operating agreement, the lack of any written agreements between Mr. Rodriguez and Echo, and the lack of any repayment or collection activity. The Commissioner argues that the deposits were loans, as reported on all of the partnership returns other than the final return.

Whether we treat amounts put into a partnership by a partner as capital contributions or loans "is not a new question."[8] Rather, this "question is one of fact."[9] We focus on the substance of the transaction, not the form. Among the factors we consider are: "(1) The presence of a written agreement; (2) the intent of

---

[8]Schnitzer v. Commissioner, 13 T.C. 43, 60 (1949), aff'd, 183 F.2d 70 (9th Cir. 1950).

[9]Schnitzer v. Commissioner, 13 T.C. at 60.

**[\*11]** the parties; and (3) the likelihood of obtaining similar loans from disinterested investors."[10]

We do not find credible petitioners' argument that Mr. Rodriguez made capital contributions. While the absence of a written loan document might support petitioners as to the first factor, the partners clearly intended to treat, and did treat, the amounts received from Mr. Rodriguez as loans.

Echo's partners' actions suggest that they considered Mr. Rodriguez' cash infusions to be loans. Echo reported the amounts as liabilities each year it operated. The Schedules K-1 Echo sent to its partners reported the amounts as liabilities every year and allocated a share of those liabilities to each partner in 2009. Mr. Hohl and Mr. Blake each filed individual returns accepting and benefiting from their characterization of these amounts as debt. If Mr. Rodriguez had made a capital contribution of $265,000 in 2009, paragraph 4.4 of the operating agreement would have required Mr. Rodriguez to include that contribution in his initial capital account balance. He did not do so. And according to the agreement, if the partnership needed additional capital contributions, Echo had to notify all partners in writing and give them an equal

---

[10]Greenberg v. Commissioner, T.C. Memo 1992-292, 63 T.C.M. (CCH) 3042, 3043 (1992).

**[*12]** opportunity to contribute.  We have no evidence of any such notices.  The record also does not include any explanation as to why Mr. Rodriguez' ownership percentage did not change as a result of his supposed additional capital contributions.  Mr. Rodriguez did not testify.

As for the third factor, the record includes no evidence that Echo could not have obtained loans from third parties.

The amounts Echo received from Mr. Rodriguez were loans.

III.    The Discharge of Debt

Gross income generally includes income from the discharge of indebtedness.[11]  The rationale for this inclusion is that the cancellation of indebtedness provides the debtor with an economic benefit that is equivalent to other forms of income.[12]  The Supreme Court has previously explained:

> When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date.  Because of this obligation, the loan proceeds do not qualify as income to the taxpayer. * * *
>
> Because of the obligation to repay, the taxpayer is entitled to include the amount of the loan in computing his basis in the property * * *
>
>     *     *     *     *     *     *     *

---

[11]Sec. 61(a)(12).

[12]See United States v. Kirby Lumber Co., 284 U.S. 1 (1931).

**[*13]** When the obligation is canceled, the * * * [debtor] is relieved of his responsibility to repay the sum he originally received * * *

\* \* \* \* \* \* \*

We therefore hold that a taxpayer must account for the proceeds of obligations he has received tax-free and included in basis. * * * [13]

When Echo's loans were canceled, section 61(a)(12) required Echo to include the entire canceled amount in the partnership's income for the year of cancellation.[14]

When a taxpayer realizes income from cancellation of indebtedness is a question of fact.[15] Discharge of a debt occurs when it becomes clear that the debt will never be repaid.[16] We look for "[a]ny 'identifiable event' which fixes the loss with certainty."[17]

---

[13]Commissioner v. Tufts, 461 U.S. 300, 307, 312-313 (1983).

[14]While partnerships usually do not pay income tax, sec. 701, the partnership's taxable income is generally computed at the partnership level, sec. 703, and then reported as distributive shares by its partners, sec. 702.

[15]See Policy Holders Agency, Inc. v. Commissioner, 41 T.C. 44, 47 (1963).

[16]Cozzi v. Commissioner, 88 T.C. 435, 445 (1987).

[17]Cozzi v. Commissioner, 88 T.C. at 445 (citing United States v. S.S. White Dental Mfg. Co., 274 U.S. 398 (1927)); see also sec. 1.6050P-1(b)(2)(i), (iv), Income Tax Regs. (providing an exclusive list of eight "identifiable events" under which debt is discharged for information reporting purposes, including the expiration of a 36-month nonpayment testing period).

[*14] It became certain in 2012 that Echo would not repay its debt to Mr. Rodriguez, and thus Echo had income from the discharge of debt for that year. The partners testified that Echo would pay Mr. Rodriguez when the venture became profitable. When Echo ceased operations, it became clear it would never be profitable. Echo ceased operations when it filed its final return in 2012. Echo's termination in 2012 is when the debt became uncollectible.

The Hohls and the Blakes argue that Echo ceased operations in 2011. But the partnership had ongoing activity in 2012, evidenced by Mr. Rodriguez' lending the partnership an additional $14,184 in that year. Echo therefore did not terminate in 2011.

## IV.   Allocating the Cancellation of Debt Income

Partners must recognize as ordinary income their distributive shares of partnership discharge of indebtedness income.[18] Except as otherwise required by the Code, a partner's distributive share of income is determined by the partnership agreement.[19] If the partnership agreement does not provide for the partner's share, or if the allocation made by the agreement does not have substantial economic effect, the partner's distributive share of income is determined "in accordance with

---

[18]Gershkowitz v. Commissioner, 88 T.C. 984, 1006-1008 (1987).

[19]Sec. 704(a).

[*15] the partner's interest in the partnership (determined by taking into account all facts and circumstances)."[20]

Echo's operating agreement allocates distributive shares of income to its partners according to a formula based on the partner's capital accounts. If those allocations have substantial economic effect, the income from the discharge of the indebtedness is allocated in the manner provided by the operating agreement.

To have substantial economic effect, allocations must be consistent with the underlying economic arrangement of the partners.[21] The allocations made by Echo's operating agreement (based on capital accounts) do not have substantial economic effect. In all other respects, the partnership and its partners shared items 30-30-30-10, instead of following the formula provided by the operating agreement. This course of conduct makes clear that Echo did not adhere to the allocations in the operating agreement and instead allocated losses on the basis of the partners' 30%, 30%, 30%, and 10% ownership interests. The partners also did not follow the operating agreement's provisions for contributing capital or maintaining capital accounts.

---

[20]Sec. 704(b).

[21]Sec. 1.704-1(b)(2)(ii)(a), Income Tax Regs.

[*16] Because the allocations provided by the operating agreement do not have substantial economic effect, the partners' distributive shares of income are determined according to their interests in the partnership.[22] A partner's interest in the partnership depends on the facts and circumstances.[23] In these cases, during all four years Echo operated, it allocated losses according to the stated 30%, 30%, 30%, and 10% ownership interests. Allocation of the income in 2012 should follow the allocation of losses for each other year of the partnership's existence. Mr. Hohl and Mr. Blake should each have included a 30% share of the income from the discharge of indebtedness in their income for 2012.

The Hohls and the Blakes argue that if Echo recognized income from the discharge of indebtedness all of that income should be allocated to Mr. Rodriguez. They argue that the loans were nonrecourse loans and therefore the lending partner bears the economic risk of loss so it is treated as a recourse liability allocated to that partner. They conclude:

> Thus, a nonrecourse loan from a partner is, in effect, treated as a recourse liability allocated solely to the lending partner. * * * [See sec. 1.704-2(b)(4), Income Tax Regs.] Its allocation is covered by the nonrecourse deduction regulations. See Treas. Reg. sec. 1.704-2(i). In other words, a partner cannot make a nonrecourse loan to a

[22]Sec. 704(b).

[23]Sec. 704(b); sec. 1.704-1(b)(3)(i), Income Tax Regs.

**[\*17]** partnership that gives other partners basis. Treas. Reg. sec. 1.752-2(c).

Their argument is incorrect for several reasons.

The partners chose to treat the liability as a recourse liability and to allocate it according to the partners' 30%, 30%, 30%, and 10% interests in the partnership. Additionally, the partners claimed, and took the tax benefit from, the additional basis arising from their shares of the loans. They were not required to structure their economic relationship that way but chose to reflect their economic arrangement as a recourse loan shared by all partners.

Further, the section 704 regulations petitioners cite govern allocations <u>attributable</u> to nonrecourse liabilities, not the allocation of the liabilities themselves, which are governed by the regulations under section 752. Under the section 752 regulations, a partnership liability is recourse to the extent a partner bears the economic risk of loss and nonrecourse to the extent no partner bears the economic risk of loss.[24] When the lender is also a partner, that partner bears the economic risk of loss to the extent that the partner makes a nonrecourse loan to the partnership and no other partner bears the economic risk of loss.[25] The regulations

---

[24]Sec. 1.752-1(a)(1) and (2), Income Tax Regs.

[25]Sec. 1.752-2(c)(1), Income Tax Regs.

[*18] contemplate a partner other than the lending partner bearing the economic risk of loss for, and receiving the corresponding allocation of, a loan made by another partner.

Finally, the item at issue is income, not a liability. Echo failed to include the income from the discharge of a debt, specifically the loans from Mr. Rodriguez. Once the loans were discharged, they ceased to be a partnership liability and instead became partnership income.

V.    Outside Bases

Ultimately, the Commissioner argues that Mr. Hohl's and Mr. Blake's distributive shares of income should include income from the discharge of indebtedness of $196,081 each (30% of the total discharged debt) but that they are each entitled to a capital loss deduction of $17,841 on the liquidation of their partnership interests. Determining the amount of income to be recognized requires a calculation of Mr. Hohl's and Mr. Blake's outside bases.

The parties disagree on how to calculate Mr. Hohl's and Mr. Blake's bases in their partnership interests in Echo. The Hohls and the Blakes argue that the guaranteed payments they received increased their outside bases. The Commissioner disagrees. The parties do not dispute the characterization of the

**[*19]** payments as guaranteed payments, and we accept their characterization of them as such.

Outside basis is a partner's adjusted basis in the partnership interest.[26] Partnerships generally do not report partners' outside bases.[27]  But partners must track their outside bases to determine the tax consequences of any nonliquidating distribution, the tax consequences upon liquidation of their partnership interests, and whether they may deduct partnership losses.[28]

Mr. Hohl and Mr. Blake had bases of zero in their interests in Echo at formation.  They received their interests in exchange for services.[29]  The receipt of a capital interest in exchange for services is treated as the receipt of property in exchange for services and is taxable compensation under section 61.[30]  At the time of formation Echo had a value of zero, so the property Mr. Hohl and Mr. Blake

---

[26]William S. McKee et al., Federal Taxation of Partnership and Partners, para. 6.01 (4th ed. 2007).

[27]See Greenwald v. Commissioner, 142 T.C. 308, 314 (2014).

[28]McKee et al., supra, para. 5.01.

[29]They did not purchase their interests or contribute property for their interests.  We note that the record includes some evidence that they contributed intellectual property but do not find any value of such a contribution anywhere in the record whereas the operating agreement and tax returns show their contributions to have been zero.

[30]McKee et al., supra, para. 14.03[1].

[*20] received for their services was zero.  Therefore, they had initial outside bases of zero.

At the close of 2009, Mr. Hohl and Mr. Blake adjusted their outside bases to take into account the partnership's activities for the year.  A distributive share of a loss decreases a partner's outside basis but not below zero.[31]  When a partner assumes liability for a share of a partnership debt, the assumption is treated as a contribution of money to the partnership.[32]  A contribution of money to a partnership increases the partner's outside basis.[33]  For 2009, Echo reported a $45,335 loss.  The partnership allocated Mr. Hohl and Mr. Blake each 30% shares of this loss, equal to $13,600 apiece.  That year, they were each also allocated 30% shares of the $345,366 partnership liability.  Therefore, at the end of 2009, Mr. Hohl and Mr. Blake each had outside bases of $117,201, representing their shares of the liability less their shares of the loss.  This process repeats through each year the partnership is in operation.

The Hohls and the Blakes argue that the loans were solely allocated to Mr. Rodriguez and that the guaranteed payments each partner received increased his

---

[31]Sec. 705(a)(2)(A).

[32]Sec. 752(a).

[33]Sec. 722.

[*21] basis.  They argue that the proper calculation of their outside bases is their guaranteed payments less their 30% shares of the loss.

Guaranteed payments do not increase outside bases.  A guaranteed payment is a "payment[] to a partner for services" that is "determined without regard to the income of the partnership."[34]  Guaranteed payments from a partnership to a partner are comparable to a salary paid by an employer to an employee.  Unlike a payment representing a return of capital, the payments are not tied to the financial success of the partnership.[35]  Like a salary, guaranteed payments are ordinary income to the partners and deductible to the partnership under section 162 or 263, as appropriate.[36]

The Hohls and the Blakes argue that because guaranteed payments are not considered part of a partner's distributive share only for purposes of section 61(a) and section 162(a), they are considered as "distributive shares of partnership income" for all other purposes.  They further argue that they may include their guaranteed payments in their outside bases under section 705(a) because the

---

[34]Sec. 707(c).

[35]McKee et al., supra, para. 14.03[1].

[36]Sec. 707(c); Cagle v. Commissioner, 63 T.C. 86, 92 (1974), aff'd, 539 F.2d 409 (5th Cir. 1976).

**[\*22]** payments are part of their distributive shares of income. The flaw in this argument is that the guaranteed payments, while income to the partners receiving the payments, are an expense at the partnership level. And Echo deducted them as a partnership expense.

We agree with the Commissioner's formula for calculating petitioners' outside bases. Mr. Hohl's and Mr. Blake's outside bases are their shares of Echo's recourse liability minus their shares of Echo's losses.[37] Therefore, for 2012, before considering the discharge of indebtedness, each had an outside basis of his share of the partnership's liability, less his previously allocated losses.

When the debt was discharged in 2012, the partnership had to recognize income in the amount of the discharged liability and each partner had to recognize his share in proportion to his interest in the partnership. This recognition of income increased their outside bases.[38] Because the liability no longer existed, each partner's share of partnership liabilities decreased, a decrease that is treated

---

[37]Contrary to the reporting on the Schedules K-1, it does not appear that Mr. Hohl, Mr. Blake, or Mr. Bowles was relieved of his share of the partnership liability between 2009 and 2010. A decrease in their shares of the partnership liability in 2010 would have caused a deemed distribution to them under section 752(b). The record does not explain the shift in reporting. Rather, consistent with their interests in the partnership, Mr. Hohl, Mr. Blake, and Mr. Bowles should have continued to receive 30% allocations of the partnership's liability.

[38]See sec. 705(a)(1)(A).

[*23] as a distribution of money to the partner by the partnership.[39] This distribution would decrease their outside bases.[40] The Hohls and the Blakes may treat their remaining outside bases as losses on the liquidation of their partnership interests.[41]

## VI.  Mr. Hohl's Insolvency

At trial, Mr. Hohl argued that he was insolvent in 2012.  Mr. Hohl argues that even if Echo realizes income from the discharge of indebtedness and he is allocated a share of that income, he does not include the allocation in his income because he was insolvent in 2012.  Mr. Hohl bears the burden of proof on this issue.[42]

Section 108(a)(1)(B) provides that gross income does not include income from the discharge of indebtedness if the discharge occurs when the taxpayer is insolvent.  While income from the discharge of indebtedness is included at the partnership level, this exception for insolvency is applied at the partner level.[43]

---

[39]See sec. 752(b).

[40]See secs. 705(a)(2), 733.

[41]See sec. 731(a)(2).

[42]See Rule 142(a).

[43]See 2925 Briarpark, Ltd. v. Commissioner, 163 F.3d 313, 316 n.1 (5th Cir.

(continued...)

[*24] A taxpayer is insolvent if the amount of his or her liabilities exceeds the fair market value of his or her assets, determined immediately before the discharge of indebtedness.[44] In the case of a taxpayer who qualifies for the insolvency exclusion, the excluded amount cannot exceed the amount by which the taxpayer is insolvent.[45]

Mr. Hohl has not established that he was insolvent at the close of 2012. At trial, he produced an insolvency worksheet showing liabilities in excess of assets by $351, but the amounts shown as liabilities in that worksheet are not adequately supported by the record; he did not provide sufficient documents to substantiate the expenses he reported on his insolvency worksheet.

VII. Conclusion

Mr. Hohl and Mr. Blake received income from the discharge of Echo's indebtedness in 2012. They are not liable for the accuracy-related penalties because the Commissioner has conceded those penalties.

---

[43](...continued)
1999), aff'g T.C. Memo 1997-298; Gershkowitz v. Commissioner, 88 T.C. at 1009.

[44]Sec. 108(d)(3).

[45]Sec. 108(a)(3).

**[*25]** To reflect the foregoing,

<u>Decisions will be entered for petitioners as to the penalties and for respondent as to all other issues</u>.